No. 24-1239

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

JOHN ALEXANDER,
*Appellant,*

*v.*

B. MYERS, et al.,
Appellees.

## Appeal from the United States District Court
## For the Middle District of Pennsylvania

### APPELLANT'S OPENING BRIEF
### AND JOINT APPENDIX
### VOLUME I OF II
### (Pages JA1 to JA44)

Elaine J. Goldenberg
Sarah E. Weiner
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave., NW
 Suite 500E
Washington, DC 20001
(202) 220-1100
Elaine.Goldenberg@mto.com
Sarah.Weiner@mto.com

Samuel David Kinder Weiss
RIGHTS BEHIND BARS
1800 M Street NW Front 1 #33821
Washington, DC 20033
(202) 455-4399
sam@rightsbehindbars.org

*Attorneys for Appellant John Alexander*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................1

JURISDICTIONAL STATEMENT .........................................................3

STATEMENT OF THE ISSUES PRESENTED.........................................3

STATEMENT OF RELATED CASES AND PROCEEDINGS .............4

STATEMENT OF THE CASE...................................................................5

    A.    Factual Background...............................................................5

    B.    Procedural History.............................................................13

SUMMARY OF ARGUMENT ...............................................................16

ARGUMENT ..........................................................................................18

I.    THE COMPLAINT PLAUSIBLY PLEADS A CLAIM FOR
    UNLAWFUL RETALIATION UNDER THE FIRST AMENDMENT ......18

    A.    Standard Of Review .........................................................19

    B.    The District Court Erred In Concluding That Interference With
            Mail And Cell Searches Cannot Constitute Adverse Actions ...........20

    C.    The District Court Erred In Concluding That Alexander's
            Protected Conduct Was Not A Substantial Factor In
            Defendants' Adverse Actions.............................................31

II.    THE DISTRICT COURT ERRED IN CONCLUDING THAT
    ALEXANDER IS NOT ENTITLED TO COMPENSATORY
    DAMAGES.................................................................................42

    A.    Standard Of Review .........................................................43

    B.    The Complaint Adequately Pleads A Physical Injury .......................43

III.    AT MINIMUM, THE DISTRICT COURT ABUSED ITS
    DISCRETION IN DENYING ALEXANDER THE OPPORTUNITY
    TO AMEND ................................................................................46

    A.    Standard Of Review .........................................................46

    B.    Alexander Should Have An Opportunity To Amend The
            Complaint ........................................................................47

IV.    THE APPEAL SHOULD NOT BE DISMISSED .......................................52

# **TABLE OF CONTENTS**
## **(Continued)**

**Page**

CONCLUSION ........................................................................................53

CERTIFICATE OF BAR MEMBERSHIP...............................................55

CERTIFICATE OF COMPLIANCE.........................................................56

CERTIFICATE OF SERVICE .................................................................57

CERTIFICATE OF ELECTRONIC FILING...........................................58

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Alexander v. Campbell*,
    No. 13-21, 2014 WL 655500 (W.D. Pa. Feb. 20, 2014) ....................................44

*Allah v. Al-Hafeez*,
    226 F.3d 247 (3d Cir. 2000) ....................................................43, 45, 46

*Allah v. Seiverling*,
    229 F.3d 220 (3d Cir. 2000) ....................................20, 25, 28, 30

*Arthur v. Maersk, Inc.*,
    434 F.3d 196 (3d Cir. 2006) ..................................................................52

*In re Asbestos Prods. Liab. Litig. (No. VI)*,
    822 F.3d 125 (3d Cir. 2016) ..................................................................26

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..............................................................................20

*Bell v. Johnson*,
    308 F.3d 594 (6th Cir. 2002) ........................................................20, 27

*Bond v. Horne*,
    553 F. App'x 219 (3d Cir. 2014) ........................................................30

*Boyd v. New Jersey Dep't of Corr.*,
    583 F. App'x 30 (3d Cir. 2014) ....................................................11, 50

*Brant v. Varano*,
    717 F. App'x 146 (3d Cir. 2017) ..................................................22, 23

*Brown v. Williams*,
    No. 00-560, 2001 WL 34368281 (D. Del. Dec. 17, 2001)................................28

*California Pub. Employees' Ret. Sys. v. Chubb Corp.*,
    394 F.3d 126 (3d Cir. 2004) ..................................................................49

*Canell v. Lightner*,
    143 F.3d 1210 (9th Cir. 1998) ..............................................................43

iii

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Connelly v. Steel Valley Sch. Dist.*,
  706 F.3d 209 (3d Cir. 2013), *as amended* (May 10, 2013) ...............................47

*Doe v. Princeton Univ.*,
  30 F.4th 335 (3d Cir. 2022) ..........................................................*passim*

*Douglas v. Reeves*,
  964 F.3d 643 (7th Cir. 2020) ..............................................................21

*Durham v. Kelley*,
  82 F.4th 217 (3d Cir. 2023) ...............................................................20

*Erickson v. Pardus*,
  551 U.S. 89 (2007)...........................................................................52

*Fallon v. Mercy Cath. Med. Ctr. of Se. Pennsylvania*,
  877 F.3d 487 (3d Cir. 2017) ...............................................................47

*Farrell v. Planters Lifesavers Co.*,
  206 F.3d 271 (3d Cir. 2000) .........................................................31, 35

*Gardenhire v. Fishman*,
  782 F. App'x 166 (3d Cir. 2019) .........................................................48

*Grayson v. Mayview State Hosp.*,
  293 F.3d 103 (3d Cir. 2002) ...............................................................50

*Hawkins v. Brooks*,
  694 F. Supp. 2d 434 (W.D. Pa. 2010)...................................................24

*Hernández-Tirado v. Lowe*,
  No. 14-1897, 2017 WL 3433690 (M.D. Pa. Aug. 10, 2017).....................27, 28

*Hill v. Fisher*,
  No. 10-459, 2010 WL 6004059 (M.D. Pa. Nov. 17, 2010),
  *report and recommendation adopted*, No. 10-459,
  2011 WL 846201 (M.D. Pa. Mar. 8, 2011) ..........................................23

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Hill v. Wetzel,*
No. 21-3009, 2022 WL 5422329 (3d Cir. Oct. 7, 2022) ....................................44

*Holbrook v. Kingston,*
552 F. App'x 125 (3d Cir. 2014) ..........................................................22, 23, 25

*Holbrook v. Kingston,*
No. 10-265, 2011 WL 4345885 (W.D. Pa. Aug. 4, 2011), *report and recommendation adopted*, No. 10-265, 2011 WL 4104933 (W.D. Pa. Sept. 15, 2011) ...................................................................................23

*Huertas v. Sobina,*
476 F. App'x 981 (3d Cir. 2012) .................................................................24, 25

*Humphrey v. Sec'y Pennsylvania Dep't of Corr.,*
712 F. App'x 122 (3d Cir. 2017) .................................................................27, 42

*Jacobs v. Beard,*
172 F. App'x 452 (3d Cir. 2006) ...........................................................17, 20, 28

*Kachmar v. SunGard Data Sys., Inc.,*
109 F.3d 173 (3d Cir. 1997) ...........................................................31, 34, 35, 37

*Kaszuba v. Borough of Dickson City,*
No. 16-1239, 2018 WL 4492813 (M.D. Pa. Sept. 19, 2018), *aff'd*, 779 F. App'x 980 (3d Cir. 2019)..............................................................40

*Kelly v. Karnes,*
No. 10-2532, 2011 WL 5040925 (M.D. Pa. Aug. 30, 2011), *report and recommendation adopted*, No. 10-2532, 2011 WL 5040900 (M.D. Pa. Oct. 24, 2011) ......................................................19

*King v. Zamiara,*
788 F.3d 207 (6th Cir. 2015) ........................................................................43

*Kotler v. Boley,*
No. 21-1630, 2022 WL 4589678 (2d Cir. Sept. 30, 2022)..................................29

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Mack v. Warden Loretto FCI*,
  839 F.3d 286 (3d Cir. 2016) ................................................................19

*Mack v. Yost*,
  968 F.3d 311 (3d Cir. 2020) ................................................................19

*Maiden Creek Assocs., L.P. v. U.S. Dep't of Transp.*,
  823 F.3d 184 (3d Cir. 2016) ..........................................................47, 50

*Marra v. Philadelphia Hous. Auth.*,
  497 F.3d 286 (3d Cir. 2007), *as amended* (Aug. 28, 2007) ..............39

*Marten v. Hunt*,
  No. 08-77, 2009 WL 1858257 (W.D. Pa. June 29, 2009) ..................27

*McAdoo v. Martin*,
  899 F.3d 521 (8th Cir. 2018) ..............................................................45

*McKee v. Hart*,
  436 F.3d 165 (3d Cir. 2006) ..........................................................20, 30

*Milhouse v. Carlson*,
  652 F.2d 371 (3d Cir. 1981) ................................................................19

*Mitchell v. Horn*,
  318 F.3d 523 (3d Cir. 2003) ........................................................*passim*

*Monroe v. Diguglielmo*,
  No. 10-3798, 2013 WL 3949074 (E.D. Pa. July 31, 2013) ................23

*Montgomery v. Ray*,
  145 F. App'x 738 (3d Cir. 2005) ....................................................27, 30

*Moore v. Mann*,
  823 F. App'x 92 (3d Cir. 2020) ...........................................................44

*Mullin v. Balicki*,
  875 F.3d 140 (3d Cir. 2017) ......................................................47, 51, 52

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Murray v. McCoy*,
No. 23-2582, 2024 WL 1328231 (3d Cir. Mar. 28, 2024) ...........................38, 40

*Nelson v. Jashurek*,
109 F.3d 142 (3d Cir. 1997) ...............................................................14

*Obiegbu v. Werlinger*,
581 F. App'x 119 (3d Cir. 2014) ........................................................41

*Page-Jones v. Berfield*,
No. 20-1042, 2021 WL 5906107 (M.D. Pa. Dec. 14, 2021) ............................27

*Parker Ave., L.P. v. Philadelphia*,
660 F. App'x 156 (3d Cir. 2016) ........................................................50

*Pearson v. Sec'y Dep't of Corr.*,
775 F.3d 598 (3d Cir. 2015) ........................................................34, 39

*Rauser v. Horn*,
241 F.3d 330 (3d Cir. 2001) .....................................................*passim*

*Rosario v. Cook*,
No. 22-866, 2024 WL 1077320 (M.D. Pa. Mar. 12, 2024)...............................27

*Shane v. Fauver*,
213 F.3d 113 (3d Cir. 2000) ...............................................................49

*Shifflett v. Korszniak*,
934 F.3d 356 (3d Cir. 2019) ........................................................48, 50

*Suppan v. Dadonna*,
203 F.3d 228 (3d Cir. 2000) ...............................................................30

*Travelers Indem. Co. v. Dammann & Co.*,
594 F.3d 238 (3d Cir. 2010) ...............................................................47

*Travillion v. Harry*,
No. 22-1196, 2024 WL 1285542 (M.D. Pa. Mar. 26, 2024)..............................27

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Valentin v. Philadelphia Cnty. Sheriff's Dep't,*
   No. 22-1527, 2023 WL 5607556 (3d Cir. Aug. 30, 2023) .................................30

*Vega v. Mullen,*
   No. 16-4620, 2018 WL 878802 (E.D. Pa. Feb. 14, 2018)..................................23

*Vo v. Wetzel,*
   No. 22-1210, 2022 WL 1467978 (3d Cir. May 10, 2022)..................................19

*Walker v. Senecal,*
   130 F.4th 291 (2d Cir. 2025) .............................................................................25

*Watson v. Rozum,*
   834 F.3d 417 (3d Cir. 2026) .......................................................................*passim*

*Williams v. Radford,*
   64 F.4th 1185 (11th Cir. 2023) ..........................................................................27

*Wolter v. Lovett,*
   No. 22-2872, 2023 WL 234760 (3d Cir. Jan. 18, 2023)....................................50

*Woodson v. Scott Paper Co.,*
   109 F.3d 913 (3d Cir. 1997) ..............................................................................40

**FEDERAL STATUTES**

28 U.S.C. § 1291 ...................................................................................................3

28 U.S.C. § 1331 ...................................................................................................3

28 U.S.C. § 1343 ...................................................................................................3

28 U.S.C. § 1367 ...................................................................................................3

28 U.S.C. § 1915(e)(2) ........................................................................................16

42 U.S.C. § 1983 ...................................................................................................3

42 U.S.C. § 1997e(e).....................................................................................*passim*

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

**RULES**

L.R. 107.2(a) ..................................................................................52, 53

**OTHER AUTHORITIES**

*Alexander v. Cumberland Cnty., Pennsylvania*,
  Case No. 19-3213 (3d Cir.)...........................................................4, 25

# INTRODUCTION

The Constitution forbids correctional officers from retaliating against prisoners for exercising their First Amendment rights. *See Rauser v. Horn*, 241 F.3d 330, 333-34 (3d Cir. 2001). But that is exactly what happened in this case. John Alexander, a prisoner in the custody of the Pennsylvania Department of Corrections, filed a lawsuit alleging that he had been assaulted by a prison guard; the defendants here retaliated by intercepting Alexander's court filings. Alexander requested medical attention for a fellow prisoner; defendants retaliated by exposing Alexander to excessive pepper spray. Alexander filed grievances using the prison's internal grievance system; defendants retaliated by transferring Alexander to a restricted housing unit, surveilling his mail, tearing apart his cell, and cutting off telephonic contact with his children. And when Alexander *still* persisted in exercising his First Amendment rights, defendants filed false misconduct charges against him, subjected him to a sham hearing, and had him transferred to segregated housing.

Despite Alexander's serious allegations of retaliatory conduct, the district court granted defendants' motion to dismiss for failure to state a claim. That decision rests on several errors that require reversal.

First, the district court wrongly concluded that several of the actions taken by defendants here were not sufficiently "adverse" because they involved interfering with mail and searching Alexander's cell. But this Court has never embraced that

sort of categorial rule.  On the contrary, this Court has cautioned that whether an action would deter a person of ordinary firmness from exercising his First Amendment rights—the test for "adversity" in this context—requires a fact-specific inquiry that is ill-suited for resolution on a motion to dismiss.  Any alleged retaliatory conduct that is more than *de minimis* should be considered by a factfinder.

Second, the district court erroneously inferred that defendants' retaliatory actions were not, in fact, motivated by Alexander's First Amendment conduct because up to a year and a half passed between Alexander's first protected activity (filing his lawsuit) and defendants' last retaliatory act (transferring Alexander to segregated housing).  By myopically focusing on that particular temporal fact, the district court inappropriately discounted allegations sufficient to show defendants' retaliatory motives, including defendants' *own admissions* to Alexander and an escalating pattern of antagonism towards him over time.

Third, the district court mistakenly overlooked Alexander's allegations that he suffered physical injury as a result of defendants' retaliatory acts.  Based on that misreading of Alexander's Complaint, the court erroneously dismissed Alexander's request for compensatory damages.

Finally, the district court compounded its errors by granting defendants' motion to dismiss without affording Alexander the opportunity to amend his Complaint.  Absent futility or inequity, neither of which exist here, this Court's

precedents require a district court to allow a plaintiff to attempt a curative amendment before dismissing his case for failure to state a claim.

The district court's order dismissing Alexander's retaliation claim and request for compensatory damages should be reversed—or, at minimum, vacated and remanded with instructions to allow Alexander to amend his Complaint.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction over this case, which asserts claims under 42 U.S.C. § 1983, *see* JA75-78 (FAC ¶¶ 126-141),[1] pursuant to 28 U.S.C. §§ 1331 and 1343. The district court entered a final order dismissing the case without leave to amend on January 16, 2024, *see* JA6 (Op.), JA4 (Order), and Alexander filed a timely notice of appeal on February 1, 2024, which the Clerk docketed on February 7, 2024, *see* JA1. This Court has jurisdiction to review the district court's final judgment under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES PRESENTED

1.      Whether the district court erred in ruling that interference with Alexander's mail, including legal mail, and an intrusive search of Alexander's cell could not, as a matter of law, constitute "adverse actions" for purposes of an

---

[1] The Complaint also asserts certain state-law claims over which the district court had supplemental jurisdiction pursuant to 28 U.S.C. § 1367. The district court dismissed those claims, see JA18-19 (Op. *13-14), and Alexander does not challenge that ruling on appeal.

unlawful retaliation claim. *See* ECF No. 25, at 13-15; ECF No. 27, at 7-11; JA13 (Op. \*8).[2]

2.      Whether the district court erred in concluding that the Complaint failed to adequately allege a causal link between Alexander's protected conduct and defendants' retaliatory actions. *See* ECF No. 25, at 13-15; ECF No. 27, at 7-11; JA13 (Op. \*8).

3.      Whether the district court incorrectly determined that Alexander's request for compensatory damages is barred by 42 U.S.C. § 1997e(e). *See* ECF No. 25, at 30-33; ECF No. 27, at 8-9, 11; JA20 (Op. \*15).

4.      Whether the district court abused its discretion in denying Alexander leave to amend. *See* JA20 (Op. \*15).

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This case has not been before this Court previously. In this case, Alexander alleges that Appellees unlawfully interfered with his prosecution of an earlier case, *Alexander v. Cumberland County, Pennsylvania*, Case No. 19-cv-947 (M.D. Pa.), the dismissal of which was appealed to this Court, *see Alexander v. Cumberland County, Pennsylvania*, Case No. 19-3213. Except for those cases, Alexander is not aware of any other case or proceeding that is in any way related, completed, pending

---

[2] References to "ECF No." refer to the docket for *Alexander v. Myers*, No. 3:22-CV-1195 (M.D. Pa.). References to "Doc. No." refer to the docket for this appeal.

or about to be presented before this Court or any other court or agency, state or federal.

## STATEMENT OF THE CASE

### A.    Factual Background

John Alexander is a prisoner in the custody of the Pennsylvania Department of Corrections.  JA6 (Op. *1).  The events giving rise to this litigation all occurred at State Correctional Institution ("SCI") Smithfield, where Alexander was housed from June 2019 through January 2021.  JA51, 73 (FAC ¶¶ 10, 118).  The operative Complaint alleges the following:

**1.    *Defendants interfere with Alexander's mail in retaliation for filing a civil rights complaint.***  In June 2017, while confined at SCI-Camp Hill, Alexander was assaulted by a corrections officer who smashed Alexander's handcuffed hands with a metal wand.  JA52 (FAC ¶ 13.)  Alexander subsequently filed a civil rights complaint in federal district court against Cumberland County and several corrections officers (the "Cumberland action").  JA52 (FAC ¶¶ 14-15.)

Alexander was transferred to SCI-Smithfield on June 20, 2019, shortly after he filed the Cumberland action.  JA6 (Op. *1), JA52 (FAC ¶¶ 10, 15).  Upon arrival, Alexander met with defendant Myers, a corrections lieutenant assigned to SCI-Smithfield's security office.  JA50, 52 (FAC ¶¶ 3, 12).  Myers "noted that

[Alexander] had an extensive grievance and litigation history" and told Alexander that "such activities would not be tolerated at SCI-Smithfield."  JA52 (FAC ¶ 12).

On June 25, 2019, Alexander submitted a packet of documents, including a completed *in forma pauperis* form, to SCI-Smithfield corrections officers for preparation and mailing to the court in the Cumberland action.  JA53 (FAC ¶ 18). Per prison policy, mail requiring verification of a prisoner's account information (including *in forma pauperis* materials) must be delivered in an unsealed envelope to a corrections officer, who then transmits the packet to the Inmate Accounts Office, which subsequently sends the completed forms to the SCI-Smithfield security office for mailing.  JA53-54, 56 (FAC ¶¶ 17, 22, 25, 33).

The *in forma pauperis* form that Alexander submitted on June 25 was incorrect because the court had inadvertently directed Alexander to fill out the wrong form.  JA81 (FAC, Ex. B).  Alexander thereafter submitted a second packet of *in forma pauperis* materials to SCI-Smithfield corrections officers on July 11, 2019, and a third packet on October 2, 2019.  JA54-55 (FAC ¶¶ 21, 28).  But neither the second nor third packet ever arrived at the court, which eventually dismissed the Cumberland action on that basis.  JA54-55, 81 (FAC ¶¶ 21-26, 28-30 & Ex. B (order indicating that the court did not receive Alexander's second or third *in forma pauperis* applications)).  Alexander then filed a grievance regarding his unmailed paperwork through the prison's internal grievance system.  JA55 (FAC ¶ 27).

Alexander's outgoing mail was intentionally intercepted by defendant Kifer (who served as the Inmate Accounts Supervisor in the Inmate Accounts Office) and/or defendants Taylor, Greenleaf, Myers, and Speck (who were assigned to the security office) in retaliation for Alexander's filing of the Cumberland action. JA50-51, 54-56 (FAC ¶¶ 2, 6, 7, 23, 25, 31-33). Defendant Greenleaf said as much to Alexander directly. In late 2020, while Alexander was awaiting transfer to a new facility, Greenleaf "approached [Alexander's] cell" and "loudly … harangue[d] … him for filing grievances and lawsuits against prison officials." JA56-57 (FAC ¶ 37). During that exchange, Greenleaf "acknowledged that he, along with others in the security office, were the ones responsible for interfering with the *in forma pauperis* documents that [Alexander had] tried to send out to the court in 2019." JA57 (FAC ¶ 37). Greenleaf made a series of similar comments over the following weeks, "brag[ging] about disrupting [Alexander's] litigation efforts" and taunting Alexander that, after transferring to a new institution, he could "'finally file a lawsuit without us interfering.'" JA57 (FAC ¶¶ 39-40).

**2.** ***Defendants continue to retaliate against Alexander for his use of the prison's grievance system.*** Alexander filed several grievances during his first few months at SCI-Smithfield, including grievances concerning actions taken by the security office. JA59 (FAC ¶ 50). Defendants retaliated by placing Alexander in the Restricted Housing Unit ("RHU"). JA62 (FAC ¶ 64). In August 2019, defendant

7

Speck (a corrections lieutenant in the security office) interviewed Alexander about one of his grievances concerning the confiscation of Alexander's personal property. JA60 (FAC ¶ 51). Defendant Speck noted that Alexander had "already filed several grievances," and Speck "warn[ed] [Alexander] that his continued pursuit of grievance[s] and lawsuits would result in negative consequences." JA60 (FAC ¶ 51). Alexander received a similar admonition a month later, in September 2019, when a fellow prisoner—one of the security office's "highly-ranked confidential informant[s]"—approached Alexander to "beg[] [him] to cease his grievances." JA60 (FAC ¶ 52). The informant "warned [Alexander] that the security office was sabotaging his *in forma pauperis* applications, and planned to further penalize him for filing grievances." JA60 (FAC ¶ 52).

On January 20, 2020, another prisoner at SCI-Smithfield assaulted a corrections officer. In response, prison officials transferred that prisoner to the RHU, where certain officers "beat [him] and … placed him in a cell." JA60 (FAC ¶ 53). Alexander and other prisoners in the RHU "started demanding medical treatment for the beaten prisoner." JA60 (FAC ¶ 53). In response, at the direction of defendants Speck, Myers, and Wiser (a supervisor in the RHU), Alexander was on three separate occasions in February 2020 "repeatedly exposed to oleoresin capsicum (OC)"—i.e., pepper spray—by corrections officers who "sprayed liberal amounts of OC on other prisoners in nearby RHU cells" without taking any

"precautions … to protect the other prisoners (including [Alexander]) from OC spill-over."  JA50, 60-61 (FAC ¶¶ 4, 54-57).  "As these incidents were occurring," Alexander and his fellow RHU prisoners "complain[ed] and express[ed] concerns" about the unjustified use of excessive OC spray and requested "ventilation and medical treatment."  JA61 (FAC ¶ 55).  Alexander "suffered injury from OC exposure during" the three use-of-force incidents, and he subsequently filed grievances regarding each of them.  JA61 (FAC ¶¶ 55, 58).

Defendant Wiser was tasked with interviewing Alexander about his OC spray grievances.  JA61 (FAC ¶ 59).  Wiser "commenced the interview by stating that the grievances were totally frivolous" and "berated" Alexander for filing them.  JA61 (FAC ¶ 59).  Wiser demanded that Alexander withdraw one of his grievances, and when Alexander refused, Wiser told Alexander "that it would go better for him … if he did not persist in pursuing the grievances."  JA61-62 (FAC ¶ 59).

But Alexander continued filing legitimate grievances.  For example, in late April or May 2020, Alexander filed a grievance when his incoming "mail was mixed and stapled together with incoming mail addressed to another prisoner."  JA63 (FAC ¶¶ 65-66).  Defendants Myers and Wiser denied the grievance, stating that "'at no time was [Alexander's] mail stapled together with [another] inmate['s] mail."  JA63 (FAC ¶ 66).  On administrative appeal, however, the superintendent determined that

Myers and Wiser's statement was false:  Alexander's mail was, in fact, comingled with another prisoner's in that way.  JA63 (FAC ¶ 67).

Around this time, defendants Wiser, Myers, Greenleaf, and Taylor began formulating a plan "to create justifications to transfer [Alexander] to the Drug Elimination Management Operation (DEMO) unit" JA62 (FAC ¶ 64), which is a segregated housing unit with limited privileges,  JA72 (FAC ¶ 111).  Defendants Myers and Speck directed security office personnel to subject all of Alexander's outgoing mail "to increased scrutiny."  JA56 (FAC ¶ 35).  And on June 24, 2020, defendant Myers issued a "misconduct report" against Alexander, accusing him of possessing contraband and engaging in unauthorized use of the mail and telephone.  JA63 (FAC ¶ 68).  Just over one week later, the hearing examiner assigned to Alexander's case "dismissed all misconduct charges" against Alexander as unsubstantiated.  JA65 (FAC ¶ 77).

The same day that defendant Myers issued the unfounded misconduct report against Alexander, defendants Wiser, Greenleaf, and Taylor conducted a punitive search of Alexander's cell.  Over the course of two hours, they "removed every staple" from every document and "left [Alexander's] personal property in complete disarray," with "papers mixed and strewn everywhere, bedding trampled on the cell floor," "food items opened and dumped out," and Alexander's "toothbrush floating in the toilet."  JA64 (FAC ¶¶ 69-70).  They also "seized [Alexander's] legal

documents, research notes, witness affidavits, photos, [and] institutional papers." JA64 (FAC ¶ 72).  When Alexander complained to Wiser and Greenleaf about the state of his cell, they responded, "this is what complaining gets you."  JA64 (FAC ¶ 71).  Greenleaf "promised further repercussions if [Alexander] continued his grievance and litigation activities."  JA64 (FAC ¶ 71).  On June 29, Alexander filed a grievance regarding the search.  JA64-65 (FAC ¶¶ 73-74).

### 3. *Defendants escalate their retaliation with a sham misconduct hearing, restrictions on Alexander's communications, and transfer to the DEMO program.*

On July 2, 2020—the same day that the misconduct case against Alexander was dismissed, and just three days after Alexander filed a grievance concerning defendants' search of his cell—defendant Myers issued a *new* misconduct report against Alexander.  JA66 (FAC ¶ 79).  Like the prior misconduct report, the new report accused Alexander of possessing contraband.  JA66 (FAC ¶ 79).  This time, however, defendants Myers and Speck arranged for a "substitute" hearing examiner—their former colleague, defendant Ellenberger—to be "specially assigned to SCI-Smithfield" to hear Alexander's case.  JA66 (FAC ¶¶ 82-83).

The hearing conducted by defendant Ellenberger was a sham.  JA70-71 (FAC ¶¶ 96-103).  Ellenberger began the misconduct hearing "by advising [Alexander] that he … was assigned to conduct the hearing as 'a favor to a friend' and that he would credit defendant Myers' allegations over [Alexander's] denial."  JA67 (FAC

¶¶ 84, 86).  Ellenberger did not permit Alexander to present any evidence or call any witnesses.  JA67-68 (FAC ¶¶ 84-85, 87).  Instead, Ellenberger insisted that Alexander plead guilty, and when Alexander refused, Ellenberger "launched into a[n] … insulting diatribe which included racial slurs."  JA67 (FAC ¶ 85).  After "stat[ing] that he did not need to view the evidence," which would have demonstrated Alexander's innocence, Ellenberger found Alexander guilty.  JA68 (FAC ¶¶ 87-88).  Ellenberger was scheduled to hear two other misconduct cases during his stint at SCI-Smithfield, but he dismissed or continued both, explaining to the accused prisoners that he "was not assigned to punish [them]," but rather had been specially "assigned to SCI-Smithfield on that date" to "make sure that th[at] asshole"—i.e., Alexander—"gets punished."  JA68-69 (FAC ¶¶ 89-90).

Alexander filed a grievance on July 7, 2020, to complain about the irregularities at his misconduct hearing.  JA69 (FAC ¶ 92).  He also submitted a "Request to Staff" on July 20 "to ask about [a] security office restriction o[n] his daughter's telephone number."  JA69 (FAC ¶ 93).  Just a few days later, on July 24, defendants Myers, Speck, and Wiser completely blocked the phone numbers of Alexander's son and daughter—effectively preventing Alexander from speaking with his children. JA70 (FAC ¶ 94).  Alexander subsequently filed a grievance about his telephone access as well.  JA70 (FAC ¶ 95).

In retaliation for Alexander's litigation and grievance activities, defendants Myers and Speck used the results of Alexander's sham misconduct hearing—in addition to their own "exaggerated" commentary on Alexander's behavior—to request that Alexander be transferred to the segregated DEMO unit. JA72 (FAC ¶¶ 108-111). Alexander was placed in the DEMO unit sometime in 2020. JA73 (FAC ¶ 113).

### B.    Procedural History

**1.    *Alexander files this action.*** After exhausting available administrative remedies, *see* JA73 (FAC ¶¶ 114-116), Alexander filed a *pro se* complaint in the U.S. District Court for the Middle District of Pennsylvania. Alexander's complaint asserted a variety of constitutional claims, including several violations of the First Amendment. *See* JA108-112 (Compl. ¶¶ 112-126).

Defendants moved to dismiss, arguing (among other things) that Alexander's complaint was time-barred. JA129-130 (Mot. 7-8). But defendants conceded that several of Alexander's claims, including his "First Amendment … retaliation claim," should "proceed to discovery" if they "survive[d] [d]efendants' statute of limitations argument." JA130 (Mot. 8). Alexander filed an amended complaint (the "Complaint"), and defendants again moved to dismiss.

**2.    *The district court erroneously dismisses the case with prejudice.*** On January 16, 2024, the district court granted defendants' motion to dismiss

Alexander's Complaint. The court correctly determined that Alexander's claims were not barred by the statute of limitations, JA8-10 (Op. *3-5), but it ultimately concluded that the Complaint failed to state a claim upon which relief could be granted, JA10-20 (Op. *5-15).

The court resolved Alexander's First Amendment retaliation claims on several different grounds.[3] The court recognized that, to state a retaliation claim under the First Amendment, a plaintiff must allege (1) "that he was engaged in a constitutionally protected activity," (2) "that he suffered some adverse action at the hands of prison officials," and (3) "that his constitutionally protected conduct was a substantial or motivating factor in the decision to discipline him." JA24 (Op. *19) (internal quotation marks omitted). As to the first prong, the court properly acknowledged that "[t]he filing of a lawsuit and grievances qualifies as constitutionally protected activity." JA26 (Op. *21). As to the second prong, however, the court held that two of the retaliatory actions taken against Alexander—interference with his mail and the punitive search of his cell—"do not constitute

---

[3] In their motion to dismiss the Complaint, defendants argued that they were entitled to qualified immunity on one of Alexander's Eighth Amendment claims, *see* ECF No. 25, at 17-19, but they chose not to raise qualified immunity as an affirmative defense to Alexander's unlawful retaliation claim. Qualified immunity is therefore not at issue in this appeal. *See Nelson v. Jashurek*, 109 F.3d 142, 147 (3d Cir. 1997) (declining to "consider [a] qualified immunity defense in the first instance" on appeal).

adverse actions for a retaliation claim."  JA26 (Op. *21).  The court offered no further analysis of the Complaint's allegations regarding these incidents.

The court disposed of the other incidents that formed the basis of Alexander's retaliation claim on a different basis:  causation.  With respect to Alexander's allegations "that he was denied phone privileges in July 2020, placed in the RHU on January 30, 2020, exposed to OC spray in February 2020, referred for placement in the DEMO program in 2020, and had misconducts issued against him in 2020," the court concluded that the Complaint failed to plausibly allege causation because Alexander did "not establish[] an 'unusually suggestive' temporal proximity between his protected conduct and the alleged adverse action[s]."  JA26 (Op. *21).  Specifically, the court found it disqualifying that "up to a year and a half" had elapsed between Alexander's initial filing of the Cumberland action and the last adverse action taken by the defendants against Alexander.  JA26 (Op. *21).

Turning to damages, the court concluded that Alexander "is not entitled to compensatory damages" under 42 U.S.C. § 1997e(e) because, as the court read it, the Complaint did "not allege that [Alexander] suffered *any* physical injury."  JA42 (Op. *37).  The court did not address Alexander's request for punitive damages or the availability of nominal damages.  *See* JA41-42 (Op. *36-37).

Finally, the court ruled that it would dismiss Alexander's case with prejudice. The court accurately observed that, "[w]hen a complaint fails to present a prima facie

case of liability, district courts must generally grant leave to amend before dismissing the complaint." JA43 (Op. *38). But the court decided to deny Alexander leave to amend anyway, reasoning that because Alexander had already amended his Compliant once, "allowing further leave to amend would be both futile and inequitable." JA44 (Op. *39).

**3.    *Alexander appeals.*** The district court entered an order granting defendants' motion to dismiss (in relevant part) and directing the clerk to close the case. *See* JA4. Alexander filed a timely notice of appeal. *See* JA1.

On March 14, 2024, this Court granted Alexander's motion to proceed *in forma pauperis* and listed the case for possible dismissal pursuant to 28 U.S.C. § 1915(e)(2) or summary action. *See* Doc. No. 11. Alexander filed argument in support of the appeal, and defendants responded with argument in support of dismissal. *See* Docs. 12, 14. On July 16, 2024, the district court notified the Clerk that Alexander's docketing and filing fees had been paid in full. *See* Doc. No. 15. By orders dated March 26, 2025, the Court entered a briefing schedule and referred to the merits panel the question of whether the appeal should be dismissed or resolved by summary action. *See* Doc Nos. 21, 22-2.

## SUMMARY OF ARGUMENT

This Court should reverse the district court's order dismissing the Complaint without leave to amend.

The district court erroneously concluded that defendants' interference with Alexander's mail and search of his cell were not sufficiently "adverse," as a matter of law, to survive a motion to dismiss. That conclusion runs afoul of this Court's decisions, which have found *both* kinds of actions sufficient to support a claim for unlawful retaliation. In adopting a categorial rule of *per se* non-adversity, the district court ignored this Court's instruction that, "unless the claimed retaliatory action is truly inconsequential, the plaintiff's claim should go to the jury." *Jacobs v. Beard*, 172 F. App'x 452, 455 (3d Cir. 2006) (citation omitted).

The district court was similarly incorrect in ruling that the Complaint failed to allege causation based on the interval of time that elapsed between Alexander's first constitutionally protected activity and defendants' last adverse action. The court's insistence on temporal proximity defies this Court's precedents. This Court has held that allegations just like those made in the Complaint, such as defendants' admissions of retaliatory motive and a pattern of antagonism over time, can support the inference that a plaintiff's First Amendment activity motivated defendants' retaliatory acts—regardless of whether there is a gap in time between the activity and the retaliation. In all events, the Complaint *does* allege temporally proximate instances of protected conduct followed by adverse actions; the district court just overlooked those allegations.

The district court also overlooked the Complaint's allegation of physical harm, flatly (and inaccurately) stating that no such allegation had been made. On that basis, the court wrongly concluded that Alexander could not recover compensatory damages.

Finally, the district court abused its discretion in dismissing Alexander's case without leave to amend, as amendment would have been neither futile nor inequitable. If this Court does not reverse the district court's order, then at minimum the court's order dismissing the case with prejudice should be vacated.

## ARGUMENT

## I.    THE COMPLAINT PLAUSIBLY PLEADS A CLAIM FOR UNLAW-FUL RETALIATION UNDER THE FIRST AMENDMENT

The Complaint more than satisfies the pleading standard for a First Amendment retaliation claim. A prisoner's claim for unlawful retaliation survives a motion to dismiss so long as the Complaint plausibly alleges "(1) constitutionally protected conduct, (2) an adverse action by prison officials sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the exercise of his constitutional rights and the adverse action taken against him." *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003) (alterations accepted and internal quotation marks omitted).

Here, the district court correctly concluded that the "filing of a lawsuit and grievances qualifies as constitutionally protected activity." JA26 (Op. *21); *see*

*Watson v. Rozum*, 834 F.3d 417, 422-23 (3d Cir. 2026); *Mack v. Warden Loretto FCI*, 839 F.3d 286, 297-99 (3d Cir. 2016); *Milhouse v. Carlson*, 652 F.2d 371, 373 (3d Cir. 1981), *abrogated on other grounds by Mack v. Yost*, 968 F.3d 311 (3d Cir. 2020). A prisoner's written requests to staff and oral complaints, too, receive First Amendment protection. *See Vo v. Wetzel*, No. 22-1210, 2022 WL 1467978, at *2 (3d Cir. May 10, 2022); *Mack*, 839 F.3d at 298-99; *Kelly v. Karnes*, No. 10-2532, 2011 WL 5040925, at *10 (M.D. Pa. Aug. 30, 2011), *report and recommendation adopted*, No. 10-2532, 2011 WL 5040900 (M.D. Pa. Oct. 24, 2011) (collecting cases).

The district court erred, however, at both the second and third prongs of the unlawful retaliation test. The court incorrectly concluded that two of the actions defendants took against Alexander to punish him for his First Amendment activity—i.e., interference with his mail and the search of his cell—were not "adverse" as a matter of law. JA26 (Op. *21). And as to the remaining adverse actions taken by defendants against Alexander, the court incorrectly ruled that the Complaint fails to allege that the defendants were motivated to retaliate against Alexander because of his protected conduct. JA26 (Op. *21). Each error requires reversal.

### A.    Standard Of Review

This Court "review[s] the grant of a motion to dismiss de novo," "accept[ing] [plaintiff's] factual allegations as true and consider[ing] those facts in the light most

favorable to [plaintiff]." *Doe v. Princeton Univ.*, 30 F.4th 335, 341-42 (3d Cir. 2022). "To survive a motion to dismiss, a complaint must … 'plausibly suggest[]' facts sufficient to 'draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). "Complaints filed *pro se* should be construed liberally and held to 'less stringent standards than formal pleadings drafted by lawyers.'" *Durham v. Kelley*, 82 F.4th 217, 223 (3d Cir. 2023) (citation omitted).

## B.    The District Court Erred In Concluding That Interference With Mail And Cell Searches Cannot Constitute Adverse Actions

The district court misapplied the adverse-action prong of the test for First Amendment retaliation to the allegations in Alexander's Complaint. The rule in this Circuit (as in others) is that "a prisoner-plaintiff satisfies [the adverse-action] requirement by demonstrating that [an] action 'was sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights.'" *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001) (second alteration in original, quoting *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000)); *Allah*, 229 F.3d at 225 (collecting cases). To clear that bar, "[a]n adverse consequence 'need not be great in order to be actionable;' rather, it need only be 'more than *de minimis*.'" *Watson*, 834 F.3d at 423 (brackets omitted; quoting *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006)). "[U]nless the claimed retaliatory action is truly 'inconsequential,' the plaintiff's claim should go to the jury." *Jacobs*, 172 F. App'x at 455 (quoting *Bell v. Johnson*,

308 F.3d 594, 603 (6th Cir. 2002)); *accord, e.g.*, *Douglas v. Reeves*, 964 F.3d 643, 647 (7th Cir. 2020) ("[w]hether retaliatory conduct is sufficiently severe to deter is generally a question of fact" that may be "resolve[d] … as a matter of law" only "when the asserted injury is truly minimal").

In a single two-sentence paragraph, the district court held as a matter of law that "interference with mail and a cell search do not constitute adverse actions for a retaliation claim." JA26 (Op. *21). That is incorrect.

**1.** With respect to Alexander's mail, the Complaint alleges that defendants twice intercepted Alexander's *in forma pauperis* applications—first in July 2019, and again in October 2019—in order to prevent those papers from reaching the court in the Cumberland action and to deter Alexander from prosecuting that action. *See* JA54-55 (FAC ¶¶ 21-26, 28-30). Defendants' actions had their intended effect: Alexander's case was dismissed, and the court denied Alexander's motion to reopen. *See* JA81 (FAC, Ex. B). Defendants Myers and Speck further subjected *all* of Alexander's outgoing mail "to increased scrutiny," requiring each piece to undergo "examination, screening[,] and review" by the security office—the very same office that had "warn[ed] [Alexander] that his continued pursuit of grievance[s] and lawsuits would result in negative consequences." JA56, 60 (FAC ¶¶ 35, 51).

Those allegations are more than sufficient at the motion to dismiss stage to adequately allege that defendants' interference with Alexander's mail would

reasonably dissuade someone in Alexander's shoes from continuing to pursue his lawsuit and grievances.  For example, in *Holbrook v. Kingston*, 552 F. App'x 125 (3d Cir. 2014), this Court held that the imposition of a so-called "mail watch," which involved reading a prisoner's "outgoing and incoming non-legal mail" and one piece of mail from his attorney "outside of [the prisoner's] presence," was "sufficiently adverse to deter [the prisoner] from exercising his constitutional rights." *Id.* at 127-28.  If surveilling a prisoner's non-legal mail and a *single piece* of mail from his attorney is sufficient to dissuade a prisoner from engaging in First Amendment conduct, then surely "examination, screening[,] and review" of all of Alexander's outgoing mail, JA56 (FAC ¶ 35), *plus* flat-out interdiction of two packets of legal mail *directed to the court*, would be enough to deter Alexander from persisting in his constitutionally protected activities.

That conclusion is further confirmed by this Court's decision in *Brant v. Varano*, 717 F. App'x 146 (3d Cir. 2017), which considered a retaliation claim brought by a prisoner alleging that "his legal material had been discarded due to his threat to file a law suit." *Id.* at 148.  The Court held that the plaintiff had "made a *prima facie* showing that he suffered adverse action" because "[h]aving legal materials destroyed during the course of active litigation is more than a *de minimis* consequence." *Id.* at 149 (citing *Watson*, 834 F.3d at 423).

This Court's decisions in *Holbrook* and *Brant* are based on the indisputable reality of prison life. "Mail is one of a prisoner's only connections with the outside world," *Vega v. Mullen*, No. 16-4620, 2018 WL 878802, at *8 (E.D. Pa. Feb. 14, 2018), and, in Alexander's case, his sole means of access to the courts. It is therefore unsurprising that many courts in this Circuit have found that surveillance of outgoing mail and/or destruction of legal mail—both of which occurred here—are each sufficiently "adverse" to support a claim for unlawful retaliation. *See, e.g.*, *Monroe v. Diguglielmo*, No. 10-3798, 2013 WL 3949074, at *10 (E.D. Pa. July 31, 2013) (allegations that defendants "destr[oyed] … plaintiff's legal materials and letters" rose "above the level required to deter a person of ordinary firmness" from exercising his constitutional rights); *Holbrook v. Kingston*, No. 10-265, 2011 WL 4345885, at *5 (W.D. Pa. Aug. 4, 2011), *report and recommendation adopted*, No. 10-265, 2011 WL 4104933 (W.D. Pa. Sept. 15, 2011) ("having all one's mail monitored would deter a person of ordinary firmness from the exercise of his constitutional rights"); *Vega*, 2018 WL 878802, at *8 (similar); *Hill v. Fisher*, No. 10-459, 2010 WL 6004059, at *8 (M.D. Pa. Nov. 17, 2010), *report and recommendation adopted*, No. 10-459, 2011 WL 846201 (M.D. Pa. Mar. 8, 2011) (similar). Indeed, the fact that so many courts have determined that interference with mail may constitute an adverse action underscores that, in most circumstances, a reasonable jury could find the same—and, consequently, that the question whether

defendants' interference with Alexander's mail was "adverse" is inappropriate for resolution on a motion to dismiss.

In reaching the conclusion that "interference with mail … do[es] not constitute [an] adverse action[] for a retaliation claim," JA26 (Op *21), the district court relied upon a single decision:  *Huertas v. Sobina*, 476 F. App'x 981 (3d Cir. 2012).  But that decision *supports* Alexander's claim.  In *Huertas*, this Court determined (in a non-precedential decision) that sporadic interference with a prisoner's "*personal mail*"—for example, confiscating photographs and "interfer[ing] with [the prisoner's] receipt of a magazine subscription"—"was not sufficiently adverse to deter a person of ordinary firmness from pursuing grievances."  *Id.* at 983-84 (emphasis added).  This Court contrasted the *Huertas* plaintiff's situation, however, with one that was "readily distinguishable" and "considerably more serious":  a case in which the plaintiff, who claimed she had been assaulted by a guard, "alleged that … other officers … withheld incoming mail … [and] outgoing mail to the courts and to attorneys."  *Id.* at 984 n.3 (citing with approval and discussing *Hawkins v. Brooks*, 694 F. Supp. 2d 434 (W.D. Pa. 2010)).

The "readily distinguishable" case, *id.*, identified in *Huertas* is a near-perfect analogue to Alexander's case.  The Complaint alleges that Alexander filed a civil rights lawsuit against a corrections officer who assaulted him and that, in retaliation, defendants intercepted Alexander's outgoing mail to the court in an effort to interfere

with that suit.  Even assuming that some amount of interference with a prisoner's personal mail is so *de minimis* that it falls below the adverse-action threshold, *but see Holbrook*, 552 F. App'x at 127-28, interference with *outgoing legal mail* is "considerably more serious," *Huertas*, 476 F. App'x at 984 n.3.  Many courts (including this one) have therefore agreed that meddling with legal mail is "adverse" enough to "deter a person of ordinary firmness from exercising his First Amendment rights." *Allah*, 229 F.3d at 225 (internal quotation marks omitted); *see, e.g.*, *Walker v. Senecal*, 130 F.4th 291, 303 & n.5 (2d Cir. 2025) (noting that "other circuits have concluded that destruction or confiscation of legal materials may amount to an adverse action" and collecting cases); pp.22-23, *supra*.

In their brief in support of dismissal before this Court, defendants argued that the Cumberland action docket "contradict[s]" Alexander's allegation that defendants interfered with his *in forma pauperis* applications.  Doc. No. 14, at 3-4.  Defendants' attempts to discredit the Complaint's factual allegations are not proper at the motion to dismiss stage.  *See Princeton Univ.*, 30 F.4th at 341-42.  They are also flat-out incorrect.  Although it is true that Alexander submitted *certain* filings in the Cumberland action in the summer and fall of 2019, the docket for that action confirms that Alexander's second and third *in forma pauperis* applications—that is, the corrected applications that Alexander attempted to resubmit at the court's direction—were never filed.  *See generally Alexander v. Cumberland County,*

*Pennsylvania*, Case No. 19-3213 (3d Cir.). Defendants ask this Court to infer that they did not interfere with Alexander's *in forma pauperis* applications simply because it appears that defendants did not interfere with certain *other* filings on the docket. But the inference that Alexander's *in forma pauperis* applications were never docketed because defendants prevented them from reaching the court is equally, if not more, plausible—and therefore must be drawn in plaintiff's favor at the motion to dismiss stage. *See, e.g.*, *In re Asbestos Prods. Liab. Litig. (No. VI)*, 822 F.3d 125, 131 (3d Cir. 2016) ("In reviewing whether [plaintiff] stated a viable claim, we must accept as true all plausible facts alleged in her amended complaint and draw all reasonable inferences in her favor.").

**2.** The Complaint also sufficiently alleges that defendants' retaliatory search of Alexander's cell was an "adverse action" that would have dissuaded an ordinary prisoner from continuing his grievance activities. *Mitchell*, 318 F.3d at 530. Defendants Greenleaf, Taylor, and Wiser tore through Alexander's personal belongings for two hours. JA64 (FAC ¶¶ 69-70). They removed every staple from every document, scattered Alexander's papers across his cell, trampled on his bedding, opened and dumped out his food, and left his toothbrush floating in the toilet. JA64 (FAC ¶ 70). They also confiscated Alexander's legal materials, including "legal documents, research notes, [and] witness affidavits." JA64 (FAC ¶ 72). Returning to a cell in such "complete disarray," JA64 (FAC ¶ 70), would

surely distress a prisoner "of ordinary firmness" and make him "think twice about" filing grievances against prison officials in the future. *Montgomery v. Ray*, 145 F. App'x 738, 741 (3d Cir. 2005). That is especially true where, as here, the same officials who rampaged through his cell specifically admonished the prisoner that "this is what complaining gets you" and threatened "further repercussions if [the prisoner] continued his grievance and litigation activities." JA64 (FAC ¶ 71).

In similar circumstances, both this Court and its sister circuits have concluded that "a retaliatory search and seizure may be sufficient to satisfy th[e] [adverse-action] prong" of a retaliation claim. *Humphrey v. Sec'y Pennsylvania Dep't of Corr.*, 712 F. App'x 122, 125 (3d Cir. 2017); *see also Bell*, 308 F.3d at 605 (plaintiff satisfied "adverse action prong" where "defendants twice left the plaintiff's cell in disarray, confiscated his legal papers … , and stole [plaintiff's] medical diet snacks"); *Williams v. Radford*, 64 F.4th 1185, 1192-93 (11th Cir. 2023) ("[T]he search of an inmate's cell and the destruction of his possessions and materials can support a First Amendment retaliation claim."). District courts in this Circuit have reached the same conclusion. *See, e.g.*, *Hernández-Tirado v. Lowe*, No. 14-1897, 2017 WL 3433690, at *10 (M.D. Pa. Aug. 10, 2017).[4]

---

[4] *See also, e.g.*, *Travillion v. Harry*, No. 22-1196, 2024 WL 1285542, at *9 (M.D. Pa. Mar. 26, 2024); *Rosario v. Cook*, No. 22-866, 2024 WL 1077320, at *3 (M.D. Pa. Mar. 12, 2024); *Page-Jones v. Berfield*, No. 20-1042, 2021 WL 5906107, at *6 (M.D. Pa. Dec. 14, 2021); *Marten v. Hunt*, No. 08-77, 2009 WL 1858257, at *7

The district court therefore erred in deeming the shakedown of Alexander's cell non-adverse *as a matter of law* based on the mistaken belief that "a cell search" can never "constitute [an] adverse action[] for a retaliation claim." JA26 (Op. *21). This Court's precedents provide no support for that categorial proposition. Instead, this Court has cautioned that a determination of whether a given action "would … deter a prisoner of ordinary firmness from exercising his or her First Amendment rights" will "depend on the facts of the particular case." *Allah*, 229 F.3d at 225. But the district court gave no consideration to the particulars of the cell search here— e.g., that defendants seized Alexander's legal materials, maliciously unstapled and reshuffled all of Alexander's papers, left his food and toothbrush in unusably unsanitary conditions, and openly admitted to Alexander that the search was orchestrated to deter him from filing additional grievances. That sort of "calculated harassment," *Hernández-Tirado*, 2017 WL 3433690, at *10, can hardly be described as "truly inconsequential," *Jacobs*, 172 F. App'x at 455, or "*de minimis*," *Watson*, 834 F.3d at 423.

**3.** In all events, the district court was wrong to consider each adverse action by itself, because neither defendants' interference with Alexander's mail nor their search of his cell happened in isolation. Rather, those actions were part of a series

---

(W.D. Pa. June 29, 2009); *Brown v. Williams*, No. 00-560, 2001 WL 34368281, at *2 (D. Del. Dec. 17, 2001).

of escalatory steps taken by defendants to deter Alexander from pursuing his lawsuit and grievances: defendants interdicted Alexander's mail, placed him in the RHU, exposed him to excessive OC spray, tossed his cell, issued unsubstantiated misconduct reports against him, subjected him to a sham misconduct hearing, blocked his children's telephone numbers, and eventually had him transferred to the more restrictive DEMO unit. JA6-7 (Op *1-2); JA54-56, 60-64, 66-73 (FAC ¶¶ 21-26, 28-30, 35, 54-57, 64, 68-71, 77, 79, 82-90, 93-94, 96-103, 108-113).

In combination, those actions would have been more than sufficient to deter a person of ordinary firmness from exercising his First Amendment rights. In *Watson v. Rozum*, for example, this Court held that actions with significantly less adverse effects—a misconduct conviction that "became part of [plaintiff's] prison record" and resulted in confiscation of plaintiff's radio—were "substantially more than a *de minimis* consequence for someone confined in a prison cell." 834 F.3d at 423; *see also Kotler v. Boley*, No. 21-1630, 2022 WL 4589678, at *2 (2d Cir. Sept. 30, 2022) ("It is … plausible that a cell search, the issuance of a disciplinary report based on an item that would usually just be thrown away, a false disciplinary report, placement in disciplinary housing, and false testimony at a disciplinary hearing could deter prisoners of ordinary firmness from exercising their constitutional right to file grievances." (internal quotation marks omitted)). The Court's logic in *Watson* applies with ever greater force to the facts of Alexander's case.

This Court has repeatedly cautioned that a court must consider the "cumulative impact" of allegedly retaliatory actions, *not* whether those "actions would be *de minimis* if considered in isolation." *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006) (citation omitted); *see also Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000) (a "campaign of harassment which though trivial in detail may have been substantial in gross"). But the district court here adopted precisely the flawed mode of analysis against which this Court has warned: the district court identified a set of discrete actions taken against Alexander, considered whether each *on its own* would have deterred an ordinary person from engaging in constitutionally protected conduct, and then entirely excluded from its analysis any of defendants' actions ostensibly falling below that threshold.[5]  *See* JA25-26 (Op. *20-21).  Thus, even if the district court were correct to conclude that defendants' interference with Alexander's mail and search of his cell could not constitute adverse actions standing alone, *but see* pp.21-28, *supra*, the court erred in failing to consider those actions in combination with *all* of defendants' retaliatory conduct.

---

[5] While the district court's slice-and-dice approach was erroneous, the court correctly concluded that each of several actions taken against Alexander was sufficient *on its own* to satisfy the adverse-action prong at the motion to dismiss stage.  JA26 (Op. *21); *see, e.g.*, *Valentin v. Philadelphia Cnty. Sheriff's Dep't*, No. 22-1527, 2023 WL 5607556, at *4 (3d Cir. Aug. 30, 2023) (excessive use of force); *Mitchell*, 318 F.3d at 530 (false misconduct charges); *Montgomery*, 145 F. App'x at 741 (revocation of opportunity to call family members); *Bond v. Horne*, 553 F. App'x 219, 223 (3d Cir. 2014) (placement in restricted housing); *Allah*, 229 F.3d at 225 (same).

**C.    The District Court Erred In Concluding That Alexander's Protected Conduct Was Not A Substantial Factor In Defendants' Adverse Actions**

The district court also erred as to the causation portion of its retaliation-claim analysis. The causation prong of an unlawful retaliation claim requires that there be "a causal link between the exercise of [a prisoner's] constitutional rights and the adverse action taken against him," *Rauser*, 241 F.3d at 333—that is, that the prisoner's "constitutionally protected conduct" was "a substantial or motivating factor in [defendants'] decision to discipline him," *Watson*, 834 F.3d at 422. A plaintiff can satisfy the causation prong in a number of ways. For instance, a complaint can plausibly allege the requisite "retaliatory motive" by offering factual allegations that reveal "either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing that suggests a causal link." *Id.* A plaintiff also may "substantiate a causal connection" with "other types of circumstantial evidence that support the inference," *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280-81 (3d Cir. 2000), or even "direct evidence of a retaliatory animus," *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 178 (3d Cir. 1997).

Here, the district court zeroed in on only one method of alleging causation—"'unusually suggestive' temporal proximity"—and concluded that the Complaint failed to establish causation because "up to a year and a half" passed between

31

Alexander's first constitutionally protected activity and defendants' last retaliatory act. JA25-26 (Op. *20-21). In doing so, the court erred several times over. It wrongly failed to consider the Complaint's other allegations *directly* demonstrating causation (i.e., defendants' own admissions), it overlooked the "pattern of antagonism" described in detail in the Complaint, *Watson*, 834 F.3d at 422, and it ignored several acts of retaliation taken just days after Alexander had engaged in protected conduct.

**1.** Defendants here did not hide their retaliatory motive; on the contrary, they openly taunted Alexander with it. The day after Alexander's arrival at SCI-Smithfield in June 2019, defendant Myers "noted that [Alexander] had an extensive grievance and litigation history, and stated that such activities would not be tolerated." JA52 (FAC ¶ 12). A few months later, during an interview concerning one of Alexander's grievances, defendant Speck noted that Alexander had "already filed several grievances" and "warn[ed] [Alexander] that his continued pursuit of grievance[s] and lawsuits would result in negative consequences." JA60 (FAC ¶ 51). In early 2020, while conducting an interview regarding a different set of grievances, defendant Wiser similarly "berated [Alexander] for filing the grievances" and warned Alexander "that it would go better for him … if he did not persist in pursuing the grievances." JA61-62 (FAC ¶ 59). After defendants tore apart Alexander's cell in June 2020, defendants Wiser and Greenleaf told Alexander

that "this is what complaining gets you," and Greenleaf "promised further repercussions if [Alexander] continued his grievance and litigation activities." JA64 (FAC ¶ 71). And in late 2020 through early 2021, while Alexander was awaiting transfer to a new facility, defendant Greenleaf *on multiple occasions* "acknowledged that he, along with others in the security office," had been "responsible for interfering with [Alexander's] *in forma pauperis* documents," "gloat[ed] about [Alexander's] RHU placement," "brag[ged] about disrupting [Alexander's] litigation efforts," and teased Alexander that "'now that you're … leaving us, you can finally file a lawsuit without us interfering.'" JA57 (FAC ¶¶ 37, 39-40); *see id.* JA57 (FAC ¶ 40) (alleging that these "encounters involving Defendant Greenleaf … are merely representative of more, similar encounters" beginning "in February 2020").

Defendants also disclosed to other prisoners their intent to retaliate against Alexander. For instance, in fall 2019, one of the security office's confidential informants "warn[ed] [Alexander] that the security office was sabotaging his *in forma pauperis* applications, and planned to further penalize him for filing grievances." JA60 (FAC ¶ 52). That prisoner "begged [Alexander] to cease his grievances, and offered to mediate between [Alexander] and the security office." JA60 (FAC ¶ 52). And later, in the midst of Alexander's sham misconduct hearing, defendant Ellenberger explained to the two other prisoners whose cases he was

scheduled to hear that Ellenberger was "only here to make sure that the asshole that just left"—that is, Alexander—"gets punished."  JA68 (FAC ¶ 89); *see also* JA69 (FAC ¶ 90).

Those allegations, which must be taken as true on a motion to dismiss, *see Princeton Univ.*, 30 F.4th at 341-42, amply demonstrate that Alexander's First Amendment activity was "a substantial or motivating factor in [defendants'] decision to discipline him," *Watson*, 834 F.3d at 422.  Defendants said so themselves, *over and over again*.  That makes Alexander's unlawful retaliation claim even more plausible than, for example, the claim at issue in *Pearson v. Secretary Department of Corrections*, 775 F.3d 598 (3d Cir. 2015), where this Court held that a single statement by a corrections officer admitting that a prisoner "was terminated [from his prison job] in retaliation for filing … grievances" was sufficient to allege retaliatory motive.  *Id.* at 604.  That was true, this Court explained, even though "the last instance of antagonism" had "occurred nearly a year prior to [the plaintiff's] termination."  *Id.*

In refusing to consider any evidence of retaliatory motive other than temporal proximity, the district court fell into an analytical trap against which this Court has pointedly warned.  In *Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, the Court took pains to "emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case."  *Id.* at 178.  Thus, although

"temporal proximity … provides an evidentiary basis from which an inference can be drawn," a court "need not consider" whether there was a "pattern of antagonism" if the plaintiff has "alleged enough direct evidence of a retaliatory animus"—for instance, statements made by the defendant to the plaintiff that "would permit a factfinder to infer" defendant's "retaliatory motives." *Id.* This Court echoed that admonition again in *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, where it explained that, "[a]lthough timing and ongoing antagonism have often been the basis for the causal link, our case law clearly has allowed a plaintiff to substantiate a causal connection for purposes of the prima facie case through other types of circumstantial evidence." *Id.* at 280-81.

**2.** It is difficult to imagine clearer evidence of defendants' retaliatory intent than their own say so. But even if something more were required here, the series of events alleged in the Complaint strongly support the inference that defendants took a series of increasingly punitive adverse actions against Alexander in an effort to shut down Alexander's First Amendment activity:

- In July and October 2019, Alexander submitted packets of *in forma pauperis* materials to defendants for mailing to the court. JA54-55 (FAC ¶¶ 21, 28). Defendants intercepted those documents. JA54-57 (FAC ¶¶ 23, 25, 31-33, 37, 39-40).

- Over a few months in the latter half of 2019, Alexander filed several grievances.   JA55, 59-60 (FAC ¶¶ 27, 50-51).   Shortly thereafter, Defendant Speck "warn[ed] [Alexander] that his continued pursuit of grievance[s] and lawsuits would result in negative consequences." JA60 (FAC ¶ 51).

- Defendants placed Alexander in the RHU, and in February 2020, he was exposed to OC spray several times after requesting medical treatment for another RHU prisoner and complaining about defendants' excessive use of OC spray.   JA60-62 (FAC ¶¶ 53-57, 64).   When Alexander filed grievances concerning the incidents, defendant Wiser warned him not to "persist in pursuing the grievances."   JA61-62 (FAC ¶¶ 58-59).

- Around late April or May 2020, Alexander filed a grievance regarding mis-delivery of his mail. JA63 (FAC ¶¶ 65-66).  Defendants Wiser and Myers falsely denied the factual basis for the grievance.  *See* JA63 (FAC ¶¶ 66-67).   The following month, defendant Myers issued an unfounded misconduct report against Alexander, JA63, 65 (FAC ¶¶ 68, 77), and defendants Wiser, Greenleaf, and Taylor conducted a punitive search of Alexander's cell, JA64 (FAC ¶¶ 69-70).

- On June 29, 2020, Alexander filed a grievance concerning defendants' search of his cell.  JA65 (FAC ¶ 74).  Just three days later, on July 2, defendant Myers issued a *second* misconduct report against Alexander, JA66 (FAC ¶ 79).  But this time, defendants Myers and Speck ensured Alexander's conviction by arranging for their friend, defendant Ellenberger, to be "specially assigned" as the hearing examiner for Alexander's case.  JA66-69 (FAC ¶¶ 82-90).

- At Alexander's hearing, defendant Ellenberger directed racial slurs at Alexander, JA67 (FAC ¶ 85), and admitted to other prisoners that Ellenberger had been specially assigned to Alexander's case to "make sure that th[at] asshole … gets punished," JA68 (FAC ¶ 89).

- On July 7, 2020, Alexander filed a grievance regarding his misconduct hearing, and on July 20, he submitted a request concerning a security restriction on his daughter's phone number.   JA69 (FAC ¶¶ 92-93).  A few days later, on July 24, defendants Myers, Speck, and Wiser blocked phone calls from *both* of Alexander's children.  JA70 (FAC ¶ 94).

- Finally, defendants Myers and Speck had Alexander transferred to a segregated housing unit.  JA72-73 (FAC ¶¶ 108-111, 113).

The foregoing allegations lay out an unmistakable "'pattern of antagonism' following [Alexander's] protected conduct." *Kachman*, 109 F.3d at 177 (citation

omitted).  Defendants spent several months interfering with Alexander's *in forma pauperis* paperwork and verbally admonishing him to stop filing grievances.  JA54-57, 60-61 (FAC ¶¶ 23, 25, 31-33, 37, 39-40, 51, 59).  When that did not work, defendants exposed him to OC spray on several occasions, tore apart his cell in a two-hour search, and issued a baseless misconduct report against him.  JA61-65 (FAC ¶¶ 58, 68-70, 77); *see Murray v. McCoy*, No. 23-2582, 2024 WL 1328231, at *2 (3d Cir. Mar. 28, 2024) (determining that there was a "genuine material factual dispute about whether [a prisoner] raised a prima facie case of retaliation" where, among other things, the prisoner had been "exonerated of three misconducts").  And when that misconduct charge was dismissed, defendants designed a plan to have Alexander transferred to a more restrictive housing unit by filing a second misconduct against him, arranging for his conviction at a sham hearing, and using the result of that hearing to justify his transfer.  JA62, 66-69, 72-73 (FAC ¶¶ 64, 79, 82-90, 108-111, 113).

Although the district court correctly recognized that "a pattern of antagonism coupled with timing that suggests a causal link" can substantiate an unlawful retaliation claim, JA25 (Op. *20, quoting *Watson*, 834 F.3d at 422), the court never *actually considered* whether the Complaint had alleged such a pattern.  Instead, with a single sentence of analysis, the court concluded that "[d]ue to the passage of time— up to a year and a half—Alexander has not established an 'unusually suggestive'

temporal proximity between his protected conduct and the alleged adverse action." JA26 (Op *21).

The court's cursory analysis is fatally flawed for several reasons. As an initial matter, the district court simply ignored everything that happened between Alexander's first constitutionally protected activity (filing the Cumberland action) and defendants' final act of retaliation (transferring Alexander to the DEMO unit). In that time, Alexander filed more than a half-dozen grievances, and defendants subjected him to nearly as many kinds of retaliatory punishments. *See* pp.5-13, 35-37, *supra*. When "considered as a whole," as they must be, those incidents paint a compelling picture of defendants' "antagonistic behavior against" Alexander. *Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286, 304-05 (3d Cir. 2007), *as amended* (Aug. 28, 2007); *see also id.* at 303 ("[W]e emphasize that it matters not … whether each piece of evidence of antagonistic conduct is alone sufficient to support an inference of causation, so long as the evidence permits such an inference when considered collectively.").

Moreover, the fact that Alexander and defendants engaged in a tit-for-tat pattern of grievance-retaliation-grievance-retaliation for "up to a year and a half," JA26 (Op *21), cannot disprove defendants' retaliatory motive, as the district court thought. *See Pearson*, 775 F.3d at 604 ("While temporal proximity is often important to establish retaliation, 'the mere passage of time is not legally conclusive

proof against retaliation.'" (quoting *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997))); *Murray*, 2024 WL 1328231, at *2 ("[B]y matching each grievance with a corresponding misconduct and simply counting the days between them, the District Court improperly ignored a 'pattern of antagonism' that was indicative of a causal nexus."). If anything, the long history of defendants' antagonism towards Alexander *supports* the inference that Alexander's protected conduct was "a substantial or motivating factor in [defendants'] decision to discipline him": Across months and months of deepening acrimony, defendants methodically punished Alexander in an attempt to silence him. *Watson*, 834 F.3d at 422; *cf. Kaszuba v. Borough of Dickson City*, No. 16-1239, 2018 WL 4492813, at *12 (M.D. Pa. Sept. 19, 2018), *aff'd,* 779 F. App'x 980 (3d Cir. 2019) (concluding that "plaintiff has not presented sufficient evidence that there was a pattern of antagonism against him by the defendants, such as having a long history of being disciplined and retaliated against by defendants").

Even if temporal proximity were the sole means of demonstrating causation (which it is not), the district court's analysis would *still* be erroneous, as the court failed to recognize several instances of "'unusually suggestive' temporal proximity," JA26 (Op *21), between Alexander's protected activity and defendants' retaliatory conduct. First, when Alexander submitted packets of *in forma pauperis* materials for mailing to the court, defendants immediately intercepted them. JA54-57 (FAC

¶¶ 21, 23, 25, 28, 31-33, 37, 39-40).   Second, within two weeks of Alexander and other RHU prisoners requesting medical treatment for a fellow prisoner, defendants sprayed the RHU with "liberal amounts of OC" spray, and defendants *continued* to use OC spray on multiple occasions after Alexander and others complained.   JA60-61 (FAC ¶¶ 53-55).   Third, just three days after Alexander filed a grievance concerning defendants' destructive search of his cell, defendant Myers issued a new misconduct report against him.   JA65-66 (FAC ¶¶ 74, 79).   And fourth, two-and-a-half weeks after Alexander filed a grievance about his sham misconduct hearing and just four days after he submitted a "request to staff" concerning a restriction on his daughter's telephone number, defendants Myers, Speck, and Wiser effectively cut off all telephonic communication between Alexander and his two children.   JA69-70 (FAC ¶¶ 92-94).   This Court has treated similar lengths of time as demonstrating "close temporal proximity" in the past.   *See, e.g.*, *Obiegbu v. Werlinger*, 581 F. App'x 119, 122 (3d Cir. 2014) (prisoner sufficiently alleged "close temporal proximity" where there was a two week delay between prisoner's "filing of a grievance and the actions taken against him").

**3.**   In support of their motion to dismiss below, defendants asked the district court to give their decisions "deference" on the ground that "prison officials … possess … expertise" that the courts lack.   ECF No. 25, at 13-14 (quoting *Rauser*, 241 F.3d at 334).   The district court correctly disregarded that request.   As this Court

explained in *Rauser*, the "burden-shifting framework" applicable to prisoner retaliation claims effectively "incorporate[s]" deference to prison officials by permitting defendants to avoid liability "by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." 241 F.3d at 334. But it is *defendants' burden* to substantiate the so-called "same decision defense," *see Watson*, 834 F.3d at 425-26, and, as a result, "dismissal on this basis" is "premature at the motion-to-dismiss stage," *Humphrey*, 712 F. App'x at 125 n.2; *cf. Watson*, 834 F.3d at 426 (holding that "a plaintiff can make out a retaliation claim even though the [misconduct] charge against him may have been factually supported" and reversing a grant of summary judgment in defendant's favor on the ground that "a reasonable fact finder could conclude that the misconduct was issued in retaliation for [plaintiff's] statement that he was going to file a grievance, and not in furtherance of legitimate penological goals").

## II.   THE DISTRICT COURT ERRED IN CONCLUDING THAT ALEXANDER IS NOT ENTITLED TO COMPENSATORY DAMAGES

The Prison Litigation Reform Act ("PLRA") provides that "[n]o Federal civil action may be brought by a prisoner … for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). This Court has interpreted that provision to require that a prisoner "demonstrate physical

injury before he can recover" any compensatory damages, even for violations of his First Amendment rights.[6] *Mitchell*, 318 F.3d at 533; *see Allah v. Al-Hafeez*, 226 F.3d 247, 250-51 (3d Cir. 2000). Such a physical injury must be "more than *de minimis*," but it may be "less than significant." *Mitchell*, 318 F.3d at 536 (hyphenation omitted). The district court erred in concluding that the Complaint fails to allege the requisite physical injury.

### A.     Standard Of Review

This Court "review[s] the grant of a motion to dismiss de novo," "accept[ing] [plaintiff's] factual allegations as true and consider[ing] those facts in the light most favorable to [plaintiff]." *Princeton Univ.*, 30 F.4th at 341-42; *see* pp.19-20, *supra*.

### B.     The Complaint Adequately Pleads A Physical Injury

The Complaint sufficiently alleges a more than *de minimis* physical injury resulting from defendants' unlawful retaliation. Specifically, the Complaint alleges

---

[6] "The applicability of [Section 1997e(e)] to claims alleging First Amendment deprivations has been a matter of significant debate." *King v. Zamiara*, 788 F.3d 207, 212 (6th Cir. 2015). Some circuits, including this Court, have "conclude[d] that First Amendment claims that do not allege physical injury necessarily allege compensable injury only in the form of mental or emotional harms." *Id.* (collecting cases). Other circuits, however, "have determined that claims alleging 'deprivation[s] of First Amendment rights entitle[] a plaintiff to judicial relief wholly aside from any physical injury he can show, or any mental or emotional injury he may have incurred.'" *Id.* (alterations in original; quoting *Canell v. Lightner*, 143 F.3d 1210, 1213 (9th Cir. 1998)). Alexander respectfully submits that the latter approach is the better one, and—while recognizing that a panel of this Court is bound by Circuit precedent—respectfully preserves the argument that this Court should change its interpretation of Section 1997e(e) as it applies to First Amendment injuries.

that Alexander "suffered injury from OC exposure during" defendants' retaliatory use of OC spray on February 2, 10 and 11, 2020. JA61 (FAC ¶ 55). Alexander's injuries were significant enough that he "demand[ed] ventilation medical treatment" as a result. JA61 (FAC ¶ 55). "[L]iberally construed and accepted as true," those allegations are sufficient to demonstrate that Alexander experienced (at least) respiratory distress, among other potential "non-de minimis physical injuries." *Hill v. Wetzel*, No. 21-3009, 2022 WL 5422329, at *3 (3d Cir. Oct. 7, 2022); *see also, e.g.*, *Moore v. Mann*, 823 F. App'x 92, 97 (3d Cir. 2020) (allegation that prisoner "was assaulted on at least two occasions" was sufficient to survive summary judgment, even though plaintiff "ha[d] not specifically described his injuries"); *cf. Alexander v. Campbell*, No. 13-21, 2014 WL 655500, at *6 (W.D. Pa. Feb. 20, 2014) (allegations that plaintiff "was exposed to second-hand pepper spray," that defendant "acted recklessly in using the chemical agent before turning off the ventilation system," and that plaintiff "suffered physical injuries as a result" were sufficient to state a claim under the Eighth Amendment, which requires "the plaintiff [to] show 'he has suffered an objectively, sufficiently serious injury [or deprivation]'" (citation omitted)).

The district court appears to have overlooked the Complaint's allegations that Alexander "suffered injury" from "repeated[] exposure to oleoresin capsicum" spray, JA60-61 (FAC ¶¶ 54-56), as evidenced by the fact that the court's opinion

states incorrectly that "Alexander does not allege that he suffered *any* physical injury," JA42 (Op. *37).  The court's misreading of the Complaint thus led it to wrongly conclude that Alexander "is not entitled to compensatory damages."  JA42 (Op. *37).

On remand, Alexander should be permitted to seek compensatory damages for his entire unlawful retaliation claim—not only the portion of his claim directly traceable to the OC spray incidents.  The PLRA's "gatekeeper function against frivolous suits does not require a prison inmate to make a showing of a physical injury *caused* by an unconstitutional act."  *McAdoo v. Martin*, 899 F.3d 521, 526 (8th Cir. 2018).  Rather, once a prisoner has made "a prior showing of physical injury," the PLRA categorically authorizes him to bring a "civil action … for mental or emotional injury suffered while in custody."  42 U.S.C. § 1997e(e); *see Mitchell*, 318 F.3d at 533 ("Section 1997e(e)[] require[s] that a prisoner demonstrate physical injury before he can recover for mental or emotional injury ….").  Therefore, "[w]ith a showing of a physical injury, § 1997e(e) permits recovery for the harm—physical or otherwise—caused by … demonstrated unconstitutional conduct."  *McAdoo*, 899 F.3d at 526.

Separately, in addition to compensatory damages, the Complaint seeks punitive damages and "other relief that this Court may deem just and appropriate," which includes nominal damages.  JA79 (FAC p. 31); *see Allah*, 226 F.3d at 251

("Although [plaintiff] does not expressly seek nominal damages in his complaint, this court has held that 'it is not necessary to allege nominal damages.'" (citation omitted)).  Defendants correctly did not challenge the availability of those remedies in their briefing below, as this Court has clearly held that "[n]either claims seeking nominal damages to vindicate constitutional rights nor claims seeking punitive damages to deter or punish egregious violations of constitutional rights are claims 'for mental or emotional injury'" within the meaning of the PLRA.  *Allah*, 226 F.3d at 252.

## III.    AT MINIMUM, THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING ALEXANDER THE OPPORTUNITY TO AMEND

For all of the reasons discussed above, this Court should reverse the district court's order granting defendants' motion to dismiss, as the Complaint "'plausibly suggest[s]' facts sufficient to 'draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Princeton Univ.*, 30 F.4th at 342 (citation omitted).  But if this Court were to conclude that the Complaint as currently pled fails to state a claim on which relief can be granted, *but see* pp.18-46, *supra*, then the district court's order dismissing the case with prejudice should be vacated so that Alexander has the opportunity on remand to amend his Complaint.

### A.    Standard Of Review

This Court "review[s] a denial of leave to amend for abuse of discretion," but reviews a district court's "determination that the amendment would be futile *de*

*novo.*" *Maiden Creek Assocs., L.P. v. U.S. Dep't of Transp.*, 823 F.3d 184, 189 (3d Cir. 2016); *accord Mullin v. Balicki*, 875 F.3d 140, 150 (3d Cir. 2017) (district court's "decision on whether to permit amendment" is reviewed "for abuse of that discretion, except where amendment is denied for legal reasons drawing *de novo* review (such as when the proposed amendment would fail to state a claim)"). "Committing a legal error constitutes an abuse of discretion." *Fallon v. Mercy Cath. Med. Ctr. of Se. Pennsylvania*, 877 F.3d 487, 494 (3d Cir. 2017).

### B.   Alexander Should Have An Opportunity To Amend The Complaint

The rule in this Circuit is that "if a complaint is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile." *Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 217 (3d Cir. 2013), *as amended* (May 10, 2013) (citation omitted); *see also Travelers Indem. Co. v. Dammann & Co.*, 594 F.3d 238, 256 n.14 (3d Cir. 2010) ("That rule applies 'even if the plaintiff does not seek leave to amend.'" (citation omitted)). "This liberal amendment regime helps effectuate the 'general policy embodied in the Federal Rules favoring resolution of cases on their merits.'" *Mullin*, 875 F.3d at 149 (citation omitted).

**1.** The district court determined that giving Alexander "further leave to amend would be both futile and inequitable" for two reasons:  because "Alexander's claims are factually and legally flawed," and because Alexander "ha[d] previously been

47

granted leave to amend." JA44 (Op. *39). Neither reason provides a valid basis for denying leave to amend Alexander's retaliation claim.

First, the district court's assessment that "Alexander's claims are factually and legally flawed," JA44 (Op. *39), merely restates the court's conclusion that the Complaint fails to state a claim on which relief can be granted. That is precisely the situation in which dismissal *without* prejudice is warranted so that the plaintiff can "add by amendment new allegations or to alter some of his existing allegations." *Shifflett v. Korszniak*, 934 F.3d 356, 366-67 (3d Cir. 2019) (rejecting defendants' argument that "amendment would be futile for substantive reasons"); *see also, e.g.*, *Gardenhire v. Fishman*, 782 F. App'x 166, 168 (3d Cir. 2019) ("Although we agree with the District Court that [plaintiff's] complaint was deficient, we are constrained to vacate its dismissal order and remand so that he may have the opportunity to file an amended complaint ….").

Second, the fact that Alexander amended his Complaint once before, *see* JA44 (Op. *39), demonstrates neither futility nor inequity, because defendants did not challenge the sufficiency of Alexander's retaliation allegations or his request for compensatory damages in their first motion to dismiss. On the contrary, in moving to dismiss Alexander's original complaint on statute-of-limitations grounds, defendants *conceded* that, if the court found Alexander's claims to be timely, then "[d]efendants fores[aw] that [Alexander's] … retaliation claim … would proceed to

48

discovery." JA130 (Mot. 8). Alexander amended his original complaint in response to defendants' motion to dismiss, but—unsurprisingly—did not attempt to "cure" the supposed "defect[s]" in his First Amendment retaliation claim, because no defects had yet been identified. *Shane v. Fauver*, 213 F.3d 113, 116 (3d Cir. 2000) (citation omitted).

In denying leave to amend based on Alexander's prior amendment, the district court appears to have embraced a *per se* rule that a plaintiff may be limited to a single opportunity to amend—regardless of whether the plaintiff's earlier amendment actually attempted to cure the defect supporting dismissal, and regardless of whether an amendment could in fact cure that deficiency. But this Court has never adopted an uncompromising rule that a plaintiff may amend only once. In fact, this Court has held just the opposite: leave to amend "*must* be given" where "a deficiency in a complaint could be cured by amendment." *Shane*, 213 F.3d at 116 (emphasis added). As a consequence, this Court's review of district courts' denials of leave to amend has focused not on the absolute number of amendments previously made by a plaintiff, but rather on whether the district court gave the plaintiff a chance to cure the deficiencies identified in the court's order of dismissal. *See, e.g.*, *California Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 165 (3d Cir. 2004) (explaining that "justice does not require that leave to amend be given" where the district court "had set forth in detail … the deficiencies in

Plaintiffs' Amended Complaint" but "Plaintiffs chose at their peril not to … avail themselves of an opportunity to rectify the deficiencies of the Amended Complaint"); *Wolter v. Lovett*, No. 22-2872, 2023 WL 234760, at *1 (3d Cir. Jan. 18, 2023) (similar); *Parker Ave., L.P. v. Philadelphia*, 660 F. App'x 156, 159-60 (3d Cir. 2016) (similar); *Boyd v. New Jersey Dep't of Corr.*, 583 F. App'x 30, 32 (3d Cir. 2014) (similar).

**2.** The district court erred in ruling that an amendment would be futile. *See Maiden Creek Assocs.*, 823 F.3d at 189 (3d Cir. 2016) (futility determination is reviewed *de novo*). Neither of the reasons given by the court—i.e., the court's view that Alexander's allegations are "flawed" and the fact that Alexander had "previously been granted leave to amend," JA44 (Op. *39)—are legally sufficient to support a futility determination. *See* pp.47-50, *supra*. Because Alexander has not yet had the opportunity to address the ostensible defects in his retaliation claim by "add[ing] by amendment new allegations or … alter[ing] some of his existing allegations," *Shifflett*, 934 F.3d at 366-67, it was necessarily premature—and an abuse of discretion—for the district court to determine that amendment would be futile.[7] *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002)

---

[7] For example, in an amended complaint, Alexander could more precisely detail the content and timing of his verbal grievances made before and in between the three separate OC spray incidents; could provide more information about the timing and circumstances surrounding his transfer to the RHU and, subsequently, to the DEMO

("[R]efusal to grant … leave [to amend] without any justifying reason" is an "abuse of … discretion.").

Additionally, the district court abused its discretion in deciding that an amendment would be "inequitable." JA44 (Op. *39). "While abuse of discretion is ordinarily a deferential standard of review, it has bite in this context" because a district court's "discretion, circumscribed by the Rule 15's directive in favor of amendment, must be 'exercised within the context of liberal pleading rules.'" *Mullin*, 875 F.3d at 150 (citation omitted). Here, there is no prejudice to defendants in allowing Alexander to amend a claim that *defendants themselves* previously agreed should "proceed to discovery." JA130 (Mot. 8). And any delay caused by such amendment is attributable to defendants, not Alexander, who belatedly decided to challenge Alexander's retaliation claim and request for compensatory damages only in their second motion to dismiss. *Compare* JA130 (Mot. 8), *with* ECF No. 25, at 13-15, 30-31.

Indeed, the inequitable result is the one the district court chose:  penalizing a *pro se* prisoner for failing to anticipate arguments *not yet made* when amending his original complaint to address arguments *actually* made by defendants. The Federal

---

unit; and could add additional allegations describing the "similar encounters" he had with defendant Greenleaf in which Greenleaf "harangue[d] [Alexander] about filing grievances." JA57 (FAC ¶ 40). He also could "allege more specifically the physical injuries he suffered." *Mitchell*, 318 F.3d at 536.

Rules' "liberal pleading regime," *Mullin*, 875 F.3d at 159, does not require that sort of omniscience from counseled litigants, much less from a *pro se* plaintiff. *Cf. Arthur v. Maersk, Inc.*, 434 F.3d 196, 206 (3d Cir. 2006) ("The liberality of Rule 15(a) counsels in favor of amendment even when a party has been less than perfect in the preparation and presentation of a case."); *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is 'to be liberally construed,' and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" (citation omitted)).

## IV.    THE APPEAL SHOULD NOT BE DISMISSED

In their brief in support of dismissal before this Court, defendants baselessly argued that this appeal should be dismissed because Alexander had not yet filed certain preliminary documents (i.e., a concise summary of the case, information statement, and transcript purchase order form). *See* Doc. No. 14, at 1. Defendants ignore, however, that dismissal for failure to prosecute is proper only after notice from the Clerk, and the Clerk never issued such notice in this case. *See* L.R. 107.2(a) (before dismissing for failure to prosecute, "the clerk will issue written notice to counsel … that upon the expiration of 14 days from the date of the notice, the appeal may be dismissed for want of prosecution unless appellant remedies the deficiency"). Moreover, defendants' grievance is now moot, as Alexander filed the missing preliminary documents within two days of this Court's receiving notice

from the district court that Alexander's docketing and filing fees had been paid.  *See* Doc. No. 15 (notice received on July 16, 2024); Docs. 16-18 (documents filed on July 18, 2024).  There is no legal basis to dismiss an appeal for failure to prosecute *after* the asserted deficiency has been cured.  *Cf.* L.R. 107.2(a).

## CONCLUSION

This Court should reverse the district court's order granting defendants' motion to dismiss Alexander's First Amendment retaliation claim.  In the alternative, this Court should vacate the district court's order dismissing the case with prejudice with instructions to grant Alexander leave to amend that claim on remand.

Dated:  July 3, 2025                    Respectfully submitted,

                                        */s/ Sarah E. Weiner*
                                        Elaine J. Goldenberg
                                        Sarah E. Weiner
                                        MUNGER, TOLLES & OLSON LLP
                                        601 Massachusetts Ave., NW
                                         Suite 500E
                                        Washington, DC 20001
                                        (202) 220-1100
                                        Elaine.Goldenberg@mto.com
                                        Sarah.Weiner@mto.com

                                        Samuel David Kinder Weiss
                                        RIGHTS BEHIND BARS
                                        1800 M Street NW Front 1 #33821
                                        Washington, DC 20033
                                        (202) 455-4399
                                        sam@rightsbehindbars.org

                        *Attorneys for Appellant John Alexander*

## CERTIFICATE OF BAR MEMBERSHIP

I hereby certify that at least one attorney whose name appears on this Brief is a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

Dated: July 3, 2025

*/s/ Sarah E. Weiner*
Sarah E. Weiner
*Attorney for Appellant*
*John Alexander*

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,362 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point, Times New Roman.

3.      The electronic copy of the Brief has been scanned for viruses and none were detected.

Dated: July 3, 2025                     */s/ Sarah E. Weiner*
                                        Sarah E. Weiner
                                        *Attorney for Appellant*
                                        *John Alexander*

## CERTIFICATE OF SERVICE

I hereby certify that on July 3, 2025, the foregoing document was served on

all parties or their counsel of record through the CM/ECF system.

Dated: July 3, 2025                    */s/ Sarah E. Weiner*
                                        Sarah E. Weiner
                                        *Attorney for Appellant*
                                        *John Alexander*

## CERTIFICATE OF ELECTRONIC FILING

I hereby certify that the text of the electronic Brief filed through the CM/ECF

system is identical to the text in the paper copies dispatched on July 3, 2025, by

Federal Express Overnight delivery to the Clerk of the Court of the United States

Court of Appeals for the Third Circuit.

Dated: July 3, 2025                    */s/ Sarah E. Weiner*
                                         Sarah E. Weiner
                                         *Attorney for Appellant*
                                         *John Alexander*

# APPENDIX

## Volume I of II
### (Bound with Appellant's Opening Brief)

Notice of Appeal (ECF No. 30) filed February 7, 2024 ....................................... JA1

Order Granting, in part, and Denying, in part, Defendants'
 Motion to Dismiss (ECF No. 29) filed January 16, 2024 ................................... JA4

Memorandum Opinion (ECF No. 28) filed January 16, 2024 ............................. JA6

## Volume II of II

District Court Docket Entries (3:22-cv-01195) .................................................. JA45

Amended Complaint (ECF No. 17) filed December 1, 2022 ............................. JA49

Original Complaint (ECF 1) filed August 5, 2022 ............................................ JA85

Defendants' Brief in Support of Their Motion to Dismiss
 Complaint (ECF No. 11) October 25, 2022 ..................................................... JA116

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE OF PENNSYLVANIA

JOHN ALEXANDER,               :     Civil No. 3:22-cv-1195
    Plaintiff             :
                           :     (Judge Mariani)
    V.                   :
                           :
B. MYERS E. SPECK, D. WISER,  :
S. ELLENBERGER, K. KIFER,    :
J. TAYLOR, C. GREENLEAF    :
    Defendants          :

*FILED*
*SCRANTON*
FEB 0 7 2024
Per _____
DEPUTY CLERK

### NOTICE OF APPEAL

**AND NOW** come John Alexander, on this <u>30th</u> day of <u>January</u> 2024, hereby files a notice of appeal from the order dated January 16, 2024, from the United States Disrtict Court for the Middle District of Pennsylvania.

John Alexander #HB6099
SCI-Phoenix
1200 Mokychic Drive
Collegeville, PA 19426

JA1

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE OF PENNSYLVANIA**

JOHN ALEXANDER,                    :        Civil No. 3:22-cv-1195
    **Plaintiff**                        :
                                  :        (Judge Mariani)
    **V.**                              :

B. MYERS E. SPECK, D. WISER,        :
S. ELLENBERGER, K. KIFER,            :
J. TAYLOR, C. GREENLEAF              :
    **Defendants**                      :

<u>**Certificate and proof of service**</u>

On this 1st day of Feburary, 2024, I caused to be served a true and correct copy of the foregoing documents upon the following government agencies in the manner listed below.

<u>**Service by first class mail postage paid to:**</u>

United States District Court
Middle District Of Pennsylvania
235 North Washington Avenue
P.O. Box 1148
Scranton, PA 18501

United States Courthouse
601 Market street, Rm. 21400
Philadelphia, PA 19106

John Alexander #HB6099
SCI-Phoenix
1200 Mokychic Drive
Collegeville, PA 19426

**JA2**

US POSTAGE

quadient
FIRST-CLASS MAIL
IMI
$000.64
02/05/2024 ZIP 19426
043M31248366

Smart Communications/PADOC

SCI- Phoenix

Name John Alexander

Number HZ6039

PO Box 33028

St Petersburg FL 33733

RECEIVED
SCRANTON

FEB 07 2024

PER DJ
DEPUTY CLERK

United States District Court
Middle District of Pennsylvania
235 North Washington Avenue
P.O. Box 1148

JA3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

JOHN ALEXANDER,           :     Civil No. 3:22-cv-1195
                              :
       Plaintiff         :     (Judge Mariani)
                              :
       v.              :
                              :
B. MYERS, E. SPECK, D. WISER,   :
S. ELLENBERGER, K. KIFER,     :
J. TAYLOR, C. GREENLEAF,    :
                              :
       Defendants     :

**ORDER**

**AND NOW**, this ___16___ day of January, 2024, upon consideration of Defendants'

motion (Doc. 21) to dismiss, and the parties' respective briefs in support of and in opposition

to said motion, and for the reasons set forth in the accompanying Memorandum, **IT IS**

**HEREBY ORDERED THAT:**

1.    The motion (Doc. 21) is **GRANTED** in part and **DENIED** in part.

    a.  The motion to dismiss this action as barred by the applicable statute of
        limitations is **DENIED**.

    b.  The motion is **GRANTED** in all other respects.

2.    The Clerk of Court is directed to **CLOSE** this case.

**JA4**

3.    Any appeal from this Order is **DEEMED** frivolous and not taken in good faith.
       *See* 28 U.S.C. § 1915(a)(3).

Robert D. Mariani
United States District Judge

**JA5**

Case: 24-1239    Document: 28    Page: 76    Date Filed: 07/03/2025

Case 3:22-cv-01195-RDM-CA    Document 28    Filed 01/16/24    Page 1 of 39          .

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JOHN ALEXANDER, | : | Civil No. 3:22-cv-1195 |
| | : | |
| Plaintiff | : | (Judge Mariani) |
| | : | |
| v. | : | |
| | : | |
| B. MYERS, E. SPECK, D. WISER, | : | |
| S. ELLENBERGER, K. KIFER, | : | |
| J. TAYLOR, C. GREENLEAF, | : | |
| | : | |
| Defendants | : | |

**MEMORANDUM**

Plaintiff John Alexander ("Alexander"), an inmate in the custody of the Pennsylvania

Department of Corrections ("DOC"), initiated this civil rights action pursuant to 42 U.S.C. §

1983.  (Doc. 1).  The matter is proceeding via an amended complaint.  (Doc. 17).  Named

as Defendants are corrections lieutenant Myers, corrections lieutenant Speck, corrections

lieutenant Wiser, corrections officer Taylor, corrections officer Greenleaf, hearing examiner

Ellenberger, and inmate accounts supervisor Kifer.  Presently before the Court is

Defendants' Rule 12(b) motion (Doc. 21) to dismiss.  For the reasons set forth below, the

motion will be granted in part and denied in part.

**I.    Allegations of the Amended Complaint**

On June 20, 2019, Alexander was transferred to the State Correctional Institution at

Smithfield ("SCI-Smithfield").  (Doc. 17 ¶ 10).  He first alleges that Defendants Myers,

Speck, Greenleaf, and Kifer violated his First Amendment right of access to the courts by

interfering with his *in forma pauperis* documents in another civil case, number 3:19-CV-947.

(*Id.* ¶¶ 14-23, 127). Alexander asserts that his other civil case, number 3:19-CV-947, was

dismissed on August 15, 2019, based on his failure to file the *in forma pauperis* documents.

(*Id.* ¶ 26). He further claims that these alleged actions constituted retaliation under the First

Amendment. (*Id.* ¶ 127).

Alexander next alleges that he was exposed to oleoresin capsicum ("OC") spray on

February 2, 2020, February 10, 2020, and February 11, 2020, when correctional officers

sprayed other inmates in the restricted housing unit ("RHU"). (*Id.* ¶¶ 54-57). He claims that

Defendants Wiser, Myers, and Speck "directed or authorized" the use of OC spray against

the other inmates. (*Id.* ¶ 57). Alexander filed grievance numbers 848561 and 851096

related to the use of OC spray. (*Id.* ¶ 58). He alleges that Defendant Wiser interviewed him

in connection with these grievances, stated that the grievances were frivolous, and asked

him to withdraw the grievances. (*Id.* ¶ 59). Alexander refused, and Defendant Wiser

allegedly told him it would be "better" if he did not continue filing grievances. (*Id.*).

On June 24, 2020, Defendants Wiser, Greenleaf, and Taylor allegedly searched

Alexander's cell and personal property, and left his property "in complete disarray." (*Id.* ¶¶

69-70). Alexander alleges that Defendants Wiser, Greenleaf, and Taylor confiscated his

legal documents, research notes, witness affidavits, photos, institutional papers, address

and phone book, and old letters. (*Id.* ¶ 72). Defendant Greenleaf gave him a confiscated

items receipt, number B924054. (*Id.* ¶ 73). Alexander claims that the receipt did not list all

2

**JA7**

of the confiscated items. (*Id.*). On June 29, 2020, Alexander filed a grievance about the

search and property confiscation. (*Id.* ¶ 74). He alleges that Defendant Myers supervised

the preparation of the confiscated items receipt and directed Defendant Greenleaf to omit

certain items. (*Id.* ¶ 76).

On July 2, 2020, Alexander attended a misconduct hearing on charges of

possession of a controlled substance, possession of contraband, conspiracy, and

unauthorized use of the mail and telephone. (*Id.* ¶¶ 77, 79). Hearing examiner Szelewski,

a non-defendant, presided over the hearing and ultimately dismissed the charges. (*Id.* ¶

77). Alexander claims that Defendant Myers was "irritated and angry" about the dismissal of

these charges and stated that the charges would be refiled. (*Id.* ¶ 78).

On July 2, 2020, Defendant Myers filed inmate misconduct number D450789,

charging Alexander with the same violations. (*Id.* ¶¶ 79-81). Alexander contends that the

charges were based on Defendant Myers' "interpretation of Plaintiff's written and verbal

communications," the alleged contraband found at Alexander's sister's residence, and

allegations that Alexander conspired with his daughter and others to smuggle drugs through

the mail. (*Id.* ¶79). A disciplinary hearing was held for misconduct number D450789 and

Defendant Ellenberger presided as the hearing examiner. (*Id*. ¶¶ 83-84). Alexander

refused to plead guilty to the charges. (*Id.* ¶¶ 85-87). He alleges that Defendant

Ellenberger declined to call witnesses or review the evidence and found him guilty of all

misconduct charges. (*Id.*). Alexander appealed the guilty finding to all levels of appeals,

3

**JA8**

and the hearing examiner's determination was upheld at every stage.  (*Id.* ¶¶ 91-92).

Alexander alleges that he was found guilty of the charges because Defendants Myers,

Speck, and Wiser "manufactured and/or 'interpreted'" evidence to implicate him, and

strategically assigned Defendant Ellenberger as the hearing examiner.  (*Id.* ¶¶ 96-102).

In 2020, Defendants Myers and Speck allegedly requested that Alexander be placed

in the DOC's Drug Elimination Management Operation ("DEMO") program.  (*Id.* ¶ 108).  The

DEMO program confines inmates to segregated housing with limited privileges for at least

one year.  (*Id.* ¶ 111).  Alexander contends that Defendants Myers and Speck relied on

misconduct number D450789 to support the request for placement into the DEMO program.

(*Id.* ¶¶ 108-110).  He further alleges that Defendants initiated this request in retaliation for

Alexander's filing of inmate grievances and civil suits.  (*Id.* ¶ 112).

Alexander also alleges that he was restricted from calling his son and daughter.  (*Id.*

¶ 93).  On July 20, 2020, he sent a request to staff member to Defendant Myers about the

restriction of his daughter's phone number.  (*Id.* ¶ 93).  In response, on July 22, 2020,

Alexander claims that Defendant Myers "implicitly acknowledged" that his daughter was not

involved in his drug-related misconduct.  (*Id.*).  He further claims that Defendants Myers,

Speck, and Wiser approved these phone restrictions.  (*Id.* ¶ 94).  Alexander asserts that

Defendants defamed his daughter because she was not involved with his alleged drug

trafficking into a state correctional facility.  (*Id.* ¶¶ 106, 136).  On July 27, 2020, Alexander

filed a grievance wherein he complained that Defendants Myers, Speck, and Wiser abused

4

**JA9**

their authority in preventing phone calls with his son and daughter. (*Id.* ¶ 95). The

grievance was denied. (*Id.*).

## II.     Legal Standard

A complaint must be dismissed under FED. R. CIV. P. 12(b)(6), if it does not allege

"enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). The plaintiff must

aver "factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct.

1937, 1949, 173 L. Ed. 2d 868 (2009).

"Though a complaint 'does not need detailed factual allegations, . . . a formulaic

recitation of the elements of a cause of action will not do.'" *DelRio-Mocci v. Connolly Prop.*

*Inc.*, 672 F.3d 241, 245 (3d Cir. 2012) (citing *Twombly*, 550 U.S. at 555). In other words,

"[f]actual allegations must be enough to raise a right to relief above the speculative level."

*Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013)

(internal citations and quotation marks omitted). A court "take[s] as true all the factual

allegations in the Complaint and the reasonable inferences that can be drawn from those

facts, but . . . disregard[s] legal conclusions and threadbare recitals of the elements of a

cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v.*

*Abbott Laboratories*, 707 F.3d 223, 231, n.14 (3d Cir. 2013) (internal citations and quotation

marks omitted).

5

**JA10**

> *Twombly* and *Iqbal* require [a district court] to take the following three steps to determine the sufficiency of a complaint: First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not show[n] - that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citations and quotation marks omitted). This "plausibility" determination will be a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

However, even "if a complaint is subject to Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008).

> [E]ven when plaintiff does not seek leave to amend his complaint after a defendant moves to dismiss it, unless the district court finds that amendment would be inequitable or futile, the court must inform the plaintiff that he or she has leave to amend the complaint within a set period of time.

*Id.*

### III.   **Discussion**

Defendants move to dismiss the amended complaint on the following grounds: (1) Alexander failed to state any claim upon which relief can be granted; (2) Alexander is not entitled to declaratory and injunctive relief; and (3) all claims are barred by the two-year

6

**JA11**

statute of limitations. (*See* Doc. 25). The Court will first address the threshold question of whether the applicable statute of limitations bars Alexander from bringing this action. The Court will then proceed to address the merits of Alexander's claims.

### A. Statute of Limitations

Defendants seek to dismiss the amended complaint as barred by the statute of limitations. (Doc. 25, pp. 36-37). They seemingly argue that because the statute of limitations defect is clear on the face of the complaint, i.e., the cause of action accrued in June of 2019, and the complaint was file-stamped on August 5, 2022, it is appropriate to address the issue on a motion to dismiss. (*Id.*).

"A complaint is subject to dismissal for failure to state a claim on statute of limitations grounds only when the statute of limitations defense is apparent on the face of the complaint." *Wisniewski v. Fisher*, 857 F.3d 152, 157 (3d Cir. 2017). "In actions under 42 U.S.C. § 1983, federal courts apply the state's statute of limitations for personal injury." *Sameric Corp. v. City of Phila.*, 142 F.3d 582, 599 (3d Cir. 1998). The statute of limitations for personal injury actions in Pennsylvania is two years. *See id.*; PA. CONS. STAT. ANN. § 5524. "A section 1983 cause of action accrues when the plaintiff knew or should have known of the injury upon which its action is based." *Sameric Corp.*, 142 F.3d at 599.

"Rule 15(c) can ameliorate the running of the statute of limitations on a claim by making the amended claim relate back to the original, timely filed complaint." *Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 193 (3d Cir. 2001). The Rule provides: an "amendment to

**JA12**

a pleading relates back to the date of the original pleading when…the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." FED. R. CIV. P. 15(c)(1)(B). "The rationale of Rule 15(c) is that a party who has been notified of litigation concerning a particular occurrence has been given all the notice that statutes of limitations were intended to provide." *Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 149 n.3 (1984).

Alexander's claims arose in Pennsylvania; thus, the applicable statute of limitations is Pennsylvania's two-year statute of limitations for personal injury actions. The allegations of the amended complaint pertain to incidents that admittedly occurred several years ago. (Doc. 17). Alexander asserts that he arrived at SCI-Smithfield on June 20, 2019, and the events at issue occurred immediately thereafter, and up until July 27, 2020. Based on these allegations, the statute of limitations began running at the latest, on July 27, 2020. Alexander filed his original complaint on July 28, 2022.[1] He filed an amended complaint on November 10, 2022.[2] The amended complaint contains essentially the same claims as the original complaint, and, therefore, relates back to the time the original complaint was filed. *See Glover v. FDIC*, 698 F.3d 139, 146 (3d Cir. 2012) (holding that "the underlying question

---

[1]   Although the docket states that the complaint was filed on August 5, 2022, this is the date it was received by the Court. Under the prisoner mailbox rule, the complaint is deemed filed when Alexander handed it to prison officials for mailing, which was on July 28, 2022. *See Pabon v. Mahanoy*, 654 F.3d 385, 391 n.8 (3d Cir. 2011) ("The federal 'prisoner mailbox rule' provides that a document is deemed filed on the date it is given to prison officials for mailing.").

[2]   The amended complaint was received on December 1, 2022, but dated November 10, 2022. *See Pabon*, 654 F.3d at 391 n.8 (discussing the federal prisoner mailbox rule).

for a Rule 15(c) analysis is whether the *original* complaint adequately notified the defendants of the basis for liability the plaintiffs would later advance in the amended complaint" (internal quotations omitted)).  Absent tolling, it appears that Alexander needed to commence this action by July 27, 2022, and that his original complaint was filed one day late on July 28, 2022.

Alexander admits that "some of the predicate events occurred in 2019" and are thus untimely.  (Doc. 27, p. 2).  However, he argues that the Court should toll the statute of limitations: (1) during the time he exhausted his prison administrative remedies; (2) because he was not aware of all the circumstances surrounding his lawsuit until approximately March, 2022 and May, 2022; and (3) because of the continuing violation doctrine.  (Doc. 17 ¶¶ 117-125; Doc. 27, pp. 2-6).

First, under the federal Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, a prisoner is required to exhaust available prison administrative remedies before commencing a lawsuit asserting claims based on his conditions of confinement.  While the prisoner exhausts such administrative remedies, the statute of limitations is tolled.  *Wisniewski*, 857 F.3d at 158.  Although some of the actions that Alexander complains of occurred more than two years prior to the filing of his complaint, the statute of limitations was tolled during the time his exhausted his grievances.  (See Doc. 17 ¶¶ 114-116).  Accordingly, it cannot be determined from the face of the complaint alone whether the statute of limitations bars Alexander's claims and Defendants' motion will be denied in this respect.

9

**JA14**

Next, Alexander argues that, with respect to Counts I and V of the amended complaint, he was not aware of all the facts necessary to bring those claims until March and May of 2022. (Doc. 27, pp. 2-3). The statute of limitations may be subject to equitable tolling where it is shown that the plaintiff exercised reasonable diligence in bringing his claims. *Campbell v. Kelly,* 87 F. App'x 234, 236 (3d Cir. 2003). However, it has been recognized that the limitations period in a § 1983 action will begin to run even if the plaintiff does not know all the facts necessary for his claim, all that is required is that the plaintiff have sufficient notice to place him on alert of the need to begin investigating. *See Gordon v. Lowell,* 95 F.Supp.2d 264, 272 (E.D. Pa. 2000); *see also New Castle Cnty. v. Halliburton NUS Corp.*, 111 F.3d 1116, 1125 (3d Cir. 1997). "[A] claim accrues upon awareness of *actual injury,* not upon awareness that the injury constitutes a *legal wrong.*" *New Castle Cnty.*, 111 F.3d at 1125 (emphases in original). Because Alexander maintains that he was not apprised of the critical facts of Counts I and V until 2022, the Court finds that he has established a basis for tolling of the limitations period.

Lastly, Alexander argues that the Court should excuse his late filing under the continuing violation doctrine. "The continuing violation[ ] doctrine is an equitable exception to the statute of limitations." *Spencer v. Courtier*, 552 F. App'x 121, 123 (3d Cir. 2014). It postpones the running of the statute of limitations "when a defendant's conduct is part of a continuing practice*." Randall v. City of Philadelphia Law Department*, 919 F.3d 196, 198 (2019) (quoting *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d

10

**JA15**

1283, 1295 (3d Cir. 1991)). "If a defendant's conduct constitutes a continuing practice, the entire claim may be timely if the last act of the practice falls within the statute of limitations." *Spencer*, 552 F. App'x at 123 (citing *Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001)). Critically, "the continuing-violation[s] doctrine focuses on continuing *acts*, not *effects*." *Randall*, 919 F.3d at 199 (emphases in original). "In other words, the doctrine relies on a *defendant's* continuing acts, not a *plaintiff's* continuing injury." *Id.* (emphasis in original). In sum, a plaintiff must demonstrate that a defendant committed at least one affirmative act within the statute of limitations, and that that act was part of a continuing practice to violate the plaintiff's rights. *Id.*; *see also Smith v. Dunn*, No. 20-2404, 2022 WL 1011214, at *2 (3d Cir. Apr. 5, 2022). In order to establish that a defendant's conduct was part of a continuing practice, a plaintiff must demonstrate that "the defendant's conduct was more than isolated or sporadic acts." *Spencer*, 552 F. App'x at 123. Applying those principles here, Alexander argues that Defendants' continuing actions occurred during the limitations period or were not immediately discovered. (Doc. 27, p. 3 n.4). Based on these allegations, the Court concludes that the continuing violations doctrine saves Alexander's claims.

At this stage, the Court must deny Defendants' motion to dismiss the action as barred by the statute of limitations.

11

**JA16**

### B. First Amendment Claims

#### 1. *Access to Courts*

Alexander alleges that Defendants violated his First Amendment right of access to the courts. In *Bounds v. Smith*, 430 U.S. 817 (1977), the Supreme Court recognized a prisoner's limited right of access to the courts. Prisoners are not necessarily "capable of filing everything" but have a right of access to "attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement." *Lewis v. Casey*, 518 U.S. 343, 355 (1996). "The right of access to the courts must be adequate, effective and meaningful and must be freely exercisable without hindrance or fear of retaliation." *Milhouse v. Carlson*, 652 F.2d 371, 374 (3d Cir. 1981) (internal citations omitted). Following *Lewis*, courts have consistently recognized that such claims require some proof of an actual, concrete injury, in the form of direct prejudice to the plaintiff in the pursuit of some legal claim. *See Oliver v. Fauver*, 118 F.3d 175 (3d Cir. 1997). An inmate must demonstrate "(1) that they suffered an actual injury—that they lost a chance to pursue a non-frivolous or arguable underlying claim; and (2) that they have no other remedy that may be awarded as recompense for the lost claim other than in the present denial of access suit." *Monroe v. Beard*, 536 F.3d 198, 205 (3d Cir. 2008) (quoting *Christopher v. Harbury*, 536 U.S. 403, 415 (2002)) (internal quotations omitted).

The confiscation or destruction of legal materials by prison officials may constitute a denial of court access. *See Zilich v. Lucht*, 981 F.2d 694, 695-96 (3d Cir. 1992). However,

12

**JA17**

Alexander has not established that "he lost the opportunity to pursue a nonfrivolous or arguable underlying legal claim due to the actions of defendants." *Blanchard v. Fed. Bureau of Prisons*, 428 F. App'x 128, 130 (3d Cir. 2011) (citing *Monroe*, 536 F.3d at 205-06). Alexander alleges that his prior civil case, number 3:19-CV-947, was dismissed for failure to submit the requisite documents to proceed *in forma pauperis*. Review of the docket for civil action number 3:19-CV-947 reveals that Alexander initiated the action without submitting the *in forma pauperis* documents. *See Alexander v. Cumberland Cnty., et al.*, No. 3:19-CV-947 (M.D. Pa.). Therefore, on June 5, 2019, the Court ordered Alexander to submit the appropriate documents. *Id.*, Doc. 8. On July 8, 2019, Alexander submitted an application to proceed *in forma pauperis*; however, the application was an incorrect form. *Id.*, Doc. 9. The Court then issued a second order directing Alexander to submit the proper financial forms. *Id.*, Doc. 10. Alexander failed to comply with the order, and the case was dismissed without prejudice on August 15, 2019. *Id.*, Doc. 11. On September 26, 2019, Alexander filed an appeal to the United States Court of Appeals for the Third Circuit. *Id.*, Doc. 12. The Third Circuit dismissed the appeal, and, on October 23, 2019, Alexander filed a motion to reopen his action in this Court. *Id.*, Docs. 14, 15. Because Alexander failed to submit the proper financial forms along with his motion, the Court denied the motion to reopen. *Id.*, Doc. 17.

In the instant action, Alexander alleges that Defendants interfered with his ability to submit documents in civil action number 3:19-CV-947. However, the docket for civil action

number 3:19-CV-947 reflects that he properly submitted filings during the time in question. In any event, Alexander has not described his allegedly lost claims with *any* specificity such that the Court could plausibly conclude that those claims are nonfrivolous or arguable. *See Presbury v. Wetzel*, 789 F. App'x 294, 295 (3d Cir. 2020) (*per curiam*) (affirming the dismissal of access to courts claim based on the CERT team's loss of plaintiff's legal property where plaintiff "did not allege any facts about the merits of his underlying claim" and did not "demonstrate that the loss of his legal materials, while unfortunate and inconvenient, has rendered him unable to seek the District Attorney's review"); *Bowens v. Matthews*, 765 F. App'x 640, 643 (3d Cir. 2019) ("To the extent that Bowens described his PCRA claim at all, he did not describe it well enough to show that it is 'nonfrivolous' or 'arguable.'"); *Monroe*, 536 F.3d at 206 (plaintiffs' allegations that "defendants confiscated their legal materials" and that "they lost the opportunity to pursue attacks of their convictions and civil rights claims" without "specify[ing] facts demonstrating that the claims were nonfrivolous" did not state a claim). A mere hope that he would have been successful is insufficient to meet the actual injury requirement. *See Monroe*, 536 F.3d at 205-06 (stating that the complainant in an access to the courts claim "must describe the underlying arguable claim well enough to show that it is 'more than mere hope', and it must describe the 'lost remedy.'") (citation omitted). Consequently, Defendants' motion to dismiss this First Amendment claim will be granted.

14

**JA19**

### 2. Interference with Mail

The Supreme Court has made clear that prisoners do not surrender all constitutional rights during their confinement, and the Supreme Court has instructed that "federal courts must take cognizance of the valid constitutional claims of prison inmates." *Turner v. Safley*, 482 U.S. 78, 84 (1987).  The Third Circuit has explained that prisoners "do not forfeit their First Amendment right to use of the mails," particularly with respect to privileged "legal mail" exchanged with counsel, and that a "pattern and practice of opening properly marked incoming [legal] mail outside an inmate's presence infringes communication protected by the right to free speech." *Bieregu v. Reno*, 59 F.3d 1445, 1452 (3d Cir. 1995), *abrogated in part by Oliver*, 118 F.3d 175; *Taylor v. Oney*, 196 F. App'x 126, 128 (3d Cir. 2006) (reaffirming holding in *Bieregu* that "prison officials impinge upon the First Amendment rights of prisoners when they open prisoners' legal mail outside the presence of the addressee prisoner.").

In order to state a claim of this sort under the First Amendment, a prisoner must allege that the interference with his legal mail was done according to a "pattern and practice." *Jones v. Brown*, 461 F.3d 353, 359 (3d Cir. 2006) ("A state pattern and practice…of opening legal mail outside the presence of the addressee inmate…impinges upon the inmate's right to freedom of speech.").  A prisoner may allege that actions were taken pursuant to a pattern or practice without the existence of a "blanket policy."  *See, e.g.*, *Jones*, 461 F.3d at 359 (distinguishing between a "pattern and practice" and an "explicit

15

**JA20**

policy"). Prisoners need not allege or prove any "actual injury" beyond the direct injury to their First Amendment right to use the mails. *Taylor*, 196 F. App'x at 128.

Notably, courts have found that mere isolated incidents of opening legal mail outside of an inmate's presence, without evidence of an improper motive, is insufficient to establish a First Amendment violation. *See, e.g.*, *Nixon v. Sec'y Pa. Dep't of Corr.*, 501 F. App'x 176, 178 (3d Cir. 2012) ("[T]he District Court correctly determined that Nixon's claim alleging a single, isolated interference with his personal mail was insufficient to constitute a First Amendment violation."); *Hale v. Pa Dept. of Corr.*, No. 3:07-cv-0345, 2010 WL 3791833, at *3 (M.D. Pa. Sept. 16, 2010) ("opening [court mail] outside [prisoner's] presence on two occasions . . . does not demonstrate a pattern or practice of improper handling of his legal mail sufficient to find a First Amendment violation . . . Isolated incidents of opening legal mail outside of an inmate's presence, without any evidence of improper motive, is nothing more than an assertion of negligence, and is insufficient to establish a constitutional violation.").

Here, Alexander contends that Defendant Kifer interfered with his mail on three separate occasions. Alexander alleges that he submitted a packet of documents to unit corrections officers on June 25, 2019. (Doc. 17 ¶ 18). The corrections officers informed Alexander that the documents would be processed. (*Id.*). On July 10, 2019, Defendant Kifer allegedly told Alexander that "the addressed envelope was missing from the packet of documents he submitted on June 26, 2019 for processing." (*Id.* ¶ 19). Alexander maintains

that he submitted a second packet for processing on July 11, 2019, which was delivered to the SCI-Smithfield security office. (*Id.* ¶¶ 20-22).

On July 15, 2019, Alexander states that he submitted another envelope, in an attempt to locate the documents from the prior mailing. (*Id.* ¶ 23). In response, on July 29, 2019, Defendant Kifer informed Alexander that the documents could not be located. (*Id.* ¶ 24). Alexander alleges that SCI-Smithfield security office received and retained the documents from his June 26, 2019 and July 15, 2019 mailings. (*Id.* ¶ 25).

On October 2, 2019, Alexander asserts that he submitted a third packet of documents. (*Id.* ¶ 28). Corrections officers assured him that the packet would be processed. (*Id.*). On October 3, 2019, Defendant Kifer told Alexander that the Inmate Accounts Office received the documents and would mail them the following day. (*Id.* ¶ 29). Alexander contends that the documents were not mailed. (*Id.* ¶ 30).

Alexander sets forth three, isolated incidents in which Defendant Kifer purportedly interfered with his legal mail. These incidents that allegedly occurred on three occasions over a three-month period do not demonstrate a pattern or practice of improper handling of his legal mail sufficient to find a First Amendment violation. *See Hale*, 2010 WL 3791833, at *3. Moreover, Defendant Kifer simply advised Alexander that he was missing an envelope, that documents could not be located, and that the Inmate Accounts Office would mail his documents. The Court finds that these isolated incidents, without any implication of

improper motive, are simply insufficient to establish a constitutional violation. Defendants' motion will be granted on this ground.

### 3. Phone Privileges

Alexander alleges that Defendants violated his constitutional rights by removing family members from his approved telephone call list. (Doc. 17 ¶¶ 93-95, 133).

The Court of Appeals for the Third Circuit has described the implicated First Amendment right as "the right to communicate with people outside prison walls." *Almahdi v. Ashcroft*, 310 F. App'x 519, 521-22 (3d Cir. 2009) (quotation omitted). Access to a telephone "provides a means of exercising that right." *Id.* Nevertheless, that right is "subject to rational limitations in the face of legitimate security interests of the penal institution." *Perez v. Federal Bureau of Prisons*, 229 F. App'x 55, 57 (3d Cir. 2007) (quoting *Strandberg v. City of Helena*, 791 F.2d 744, 747 (9th Cir. 1986)). In other words, "prisoners 'ha[ve] no right to unlimited telephone use,' and reasonable restrictions on telephone privileges do not violate their First Amendment rights." *Almahdi*, 310 F. App'x at 522 (noting that "regulations limiting telephone use by inmates have been routinely sustained as reasonable."). Where there are alternative means of communicating with persons outside of the prison, such as in person visits or mail, the restrictions on telephone use is more likely to be considered reasonable. *See Almahdi*, 310 F. App'x at 522; *Ortiz-Medina v. Bradley*, No. 19-2133, 2020 WL 362697, at *5 (M.D. Pa. Jan. 22, 2020). Alexander provides no factual allegations about whether he had alternate means of communicating with his son and

daughter, and his allegations do not support a plausible inference that any limitations on phone use was not rational. As pled, the Court is unable to discern a plausible constitutional violation. *See Aruanno v. Johnson*, 568 F. App'x 194, 195 (3d Cir. 2014) (*per curiam*) (holding that conclusory allegations "concerning [prisoner's] lack of phone access to friends and family" failed to state a claim). Accordingly, Alexander's First Amendment claim based on telephone usage will be dismissed.

### 4. Retaliation

To state a retaliation claim under the First Amendment, a plaintiff bears the burden of satisfying three elements. First, a plaintiff must prove that he was engaged in a constitutionally protected activity. *See Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001). Second, a plaintiff must demonstrate that he "suffered some 'adverse action' at the hands of prison officials." *Id.* (quoting *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000)). This requirement is satisfied by showing adverse action "sufficient 'to deter a person of ordinary firmness' from exercising his First Amendment rights." *Id.* (quoting *Suppon v. Dadonna*, 2013 F.3d 228, 235 (3d Cir. 2000)). Third, a prisoner must prove that "his constitutionally protected conduct was 'a substantial or motivating factor' in the decision to discipline him." *Rauser*, 241 F.3d at 333-34 (quoting *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

The mere fact that an adverse action occurs after either a complaint or grievance is filed is relevant, but not dispositive, for the purpose of establishing a causal link between the

two events. *See Lape v. Pennsylvania*, 157 F. App'x 491, 498 (3d Cir. 2005)

(nonprecedential). Only when the facts of a particular case are "unusually suggestive" of a

retaliatory motive will temporal proximity, on its own, support an inference of causation. *See*

*Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997). The Third Circuit has noted

that an inmate can satisfy this burden "with evidence of either (1) an unusually suggestive

temporal proximity between the protected activity and the allegedly retaliatory action or (2) a

pattern of antagonism coupled with timing that suggests a causal link." *Watson v. Rozum*,

834 F.3d 417, 422 (3d Cir. 2002).

If a prisoner establishes a *prima facie* case of retaliation, the burden shifts to prison

officials to show, by a preponderance of the evidence, that "they would have made the

same decision absent the protected conduct for reasons reasonably related to a legitimate

penological interest." *Rauser*, 241 F.3d at 334. "This is often referred to as the 'same

decision defense.'" *Watson*, 834 F.3d at 422. If the prison officials can make this showing,

it defeats the retaliation claim. *See Carter v. McGrady*, 292 F.3d 152, 159 (3d Cir. 2002).

Alexander alleges that Defendants retaliated against him for filing a lawsuit and

grievances. The alleged retaliatory acts include interfering with his mail for a 2019 civil

case, searching his cell on June 24, 2020, placing him in the RHU on January 30, 2020,

exposing him to OC spray in the RHU in February 2020, denying him phone privileges on

July 24, 2020, recommending placement in the DEMO program in 2020, and filing

misconducts in 2020.

20

**JA25**

The filing of a lawsuit and grievances qualifies as constitutionally protected activity. *See Watson*, 834 F.3d at 422-23. However, Alexander has failed to adequately allege that the filing of his prior lawsuit and grievances motivated the Defendants to take adverse action.

First, interference with mail and a cell search do not constitute adverse actions for a retaliation claim. *See Huertas v. Sobina*, 476 F. App'x 981, 984 (2012) (holding that interfering with an inmate's mail "was not sufficiently adverse to deter a person of ordinary firmness from pursuing grievances"); *Banks v. Rozum*, 2015 WL 1186224, *7 (M.D. Pa. 2015) (holding that the search of a cell is not a sufficient adverse action), *aff'd*, 639 F. App'x 778, 781-82 (3d Cir. 2016).

Next, Alexander asserts that he was denied phone privileges in July 2020, placed in the RHU on January 30, 2020, exposed to OC spray in February 2020, referred for placement in the DEMO program in 2020, and had misconducts issued against him in 2020. Due to the passage of time—up to a year and a half—Alexander has not established an "unusually suggestive" temporal proximity between his protected conduct and the alleged adverse action. *See Williams v. Phila. Housing Authority Police Dept.*, 380 F.3d 751, 760 (3d Cir. 2004).

Alexander's amended complaint, as pled, fails to set forth a retaliation claim. The Court will grant Defendants' motion to dismiss the First Amendment retaliation claim.

**C.** **Eighth Amendment Claim Regarding Placement in the RHU and Cell Search**

In order to succeed on a claim as to one's conditions of confinement, a plaintiff must establish that: "(1) he was incarcerated under conditions imposing a substantial risk of serious harm, (2) the defendant-official was deliberately indifferent to that substantial risk to his health and safety, and (3) the defendant-official's deliberate indifference caused him harm." *See Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2015). "[T]he Constitution does not mandate comfortable prisons." *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981). Therefore, conditions of imprisonment violate the Eighth Amendment only if they, "alone or in combination…deprive inmates of the minimal civilized measures of life's necessities." *See id.* at 347. Such necessities include "adequate food, clothing, shelter, and medical care." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Thus, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson*, 503 U.S. at 9. However, "[s]ome conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 372 (3d Cir. 2019) (quoting *Wilson*, 501 U.S. at 304 and *Rhodes*, 452 U.S. at 347).

Alexander maintains that his stay in the RHU violated the Eighth Amendment's prohibition against cruel and unusual punishment. (Doc. 17 ¶ 130). The Supreme Court has held that "[i]t is well settled that the decision where to house inmates is at the core of

22

**JA27**

prison administrators' expertise." *McKune v. Lile*, 536 U.S. 24, 39 (2002). Thus, a transfer

of a prisoner to the RHU alone does not violate the Eighth Amendment. *See Williams v.*

*Armstrong*, 566 F. App'x 106, 109 (3d Cir. 2014) (because the Eighth Amendment applies

only when a deprivation results in the denial of "the minimal civilized measure of life's

necessities," placement of prisoner in RHU for 112 days alone, without allegation that he

was denied life's necessities, did not state a claim for relief); *Gibson v. Lynch*, 652 F.2d 348

(3d Cir. 1981) (incarceration in solitary confinement for 90 days did not violate the Eighth

Amendment); *Griffin v. Vaughn*, 112 F.3d 703, 709 (placement in administrative custody for

15 months did not violate the Eighth Amendment).

Alexander maintains further that the cell search violated his Eighth Amendment

rights. The Eighth Amendment protects prisoners from searches conducted only for

"calculated harassment." *Hudson v. Palmer*, 468 U.S. 517, 530 (1984). A single cell search

is generally insufficient to constitute an Eighth Amendment violation. *See Kokinda v. Pa.*

*Dep't of Corrs.*, 2016 WL 7029385, at *7 (W.D. Pa. Oct. 31, 2016); *Vigliotto v. Terry*, 873

F.2d 1201, 1203 (9th Cir. 1989); *Tate v. Campbell*, 85 F. App'x 413, 417 (6th Cir. 2003)

(stating that "the single search of a prisoner's cubicle does not rise to the level of an Eighth

Amendment violation").

In short, Alexander has failed to plead viable claims based on alleged violations of

the Eighth Amendment. These claims will be dismissed.

### D. Defendants are entitled to Qualified Immunity on the Exposure to OC Spray Claim

As stated, prison officials may violate an inmate's rights under the Eighth Amendment to the United States Constitution by displaying deliberate indifference to a substantial risk of serious harm to an inmate. Alexander alleges that Defendants used OC spray on other inmates in the RHU on three occasions. (Doc. 17 ¶¶ 54-55). He has not alleged that the OC spray was used in a greater quantity than necessary on these other inmates. Nor has he alleged that the use of OC spray on other inmates housed in different cells posed a serious risk of harm to him, and that the Defendants were subjectively aware of such a risk. As such, this Eighth Amendment claim fails. *See Gibson v. Flemming*, 837 F. App'x 860, 862 (3d Cir. 2020) (single unplanned use of OC spray did not violate the Eighth Amendment).

However, even if Alexander had stated a colorable constitutional claim relating to his exposure to secondhand OC spray, Defendants, in their individual capacities, are entitled to qualified immunity from these claims for damages. In order to establish a civil rights claim, Alexander must show the deprivation of a right secured by the United States Constitution or the laws of the United States. However, government officials performing "discretionary functions," are insulated from suit if their conduct did not violate a "clearly established statutory or constitutional right[ ] of which a reasonable person would have known." *Wilson v. Layne*, 526 U.S. 603, 609 (1999).

24

**JA29**

"The doctrine of qualified immunity protects government officials from liability for civil

damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." *Pearson v.*

*Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). "Qualified immunity

balances two important interests—the need to hold public officials accountable when they

exercise power irresponsibly and the need to shield officials from harassment, distraction,

and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. It

"provides ample protection to all but the plainly incompetent or those who knowingly violate

the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "Thus, so long as an official

reasonably believes that his conduct complies with the law, qualified immunity will shield

that official from liability." *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012) (citing

*Pearson*, 555 U.S. at 244). Although qualified immunity is generally a question of law that

should be considered at the earliest possible stage of the proceedings, a genuine dispute of

material fact may preclude summary judgment on qualified immunity. *Giles v. Kearney*, 571

F.3d 318, 325-26 (3d Cir. 2009).

A qualified immunity determination involves a two-pronged inquiry: (1) whether a

constitutional or federal right has been violated; and (2) whether that right was "clearly

established." *Saucier v. Katz,* 533 U.S. 194, 201 (2001), *overruled in part by Pearson*, 555

U.S. at 236 (permitting federal courts to exercise discretion in deciding which of the two

*Saucier* prongs should be addressed first). A right is clearly established if "every

25

**JA30**

reasonable official would have understood that what he is doing violates that right."

*Mullenix v. Luna*, 577 U.S. 7, 11 (2015).  To be clearly established, there does not have to

be a case that is directly on point, "but existing precedent must have placed the statutory or

constitutional question beyond debate."  *Id.* (quoting *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741

(2011)).  In determining whether a right is clearly established, courts must not define the

right "at a high level of generality."  *Id.* (quoting *Al-Kidd*, 563 U.S. at 742).  Rather, the

analysis should focus on "whether the violative nature of particular conduct is clearly

established."  *Id.* (quoting *Al-Kidd*, 563 U.S. at 742).  "The relevant, dispositive inquiry in

determining whether a right is clearly established is whether it would be clear to a

reasonable officer that his conduct was unlawful in the situation he confronted."  *Saucier*,

533 U.S. at 202.  It is the plaintiff who bears the initial burden of demonstrating that the

constitutional right at issue was clearly established at the time of the claimed violation.  *See*

*Davis v. Scherer*, 468 U.S. 183, 197 (1984) ("A plaintiff who seeks damages for violation of

constitutional or statutory rights may overcome the defendant official's qualified immunity

only by showing that those rights were clearly established at the time of the conduct at

issue.").

  To determine whether a right is clearly established, the court may look to cases from

the Supreme Court, controlling circuit precedent, or "a robust consensus of cases of

persuasive authority" from other circuit courts.  *Porter v. Pa. Dep't of Corrs.*, 974 F.3d 431,

26

**JA31**

449 (3d Cir. 2020) (quoting *Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.*, 877 F.3d 136, 142 (3d Cir. 2017)).

Here, the Court cannot conclude that it was clearly established that inadvertent exposure to OC spray used against another inmate would violate an individual's Eighth Amendment rights.  Indeed, several courts in this district have granted qualified immunity in this setting.  *See e.g., Rivera v. Redfern*, 2023 WL 2139827, at *9 (M.D. Pa. Feb. 21, 2023) (collecting cases and granting qualified immunity because "it is not clearly established that secondhand exposure to OC spray in response to another inmate's actions across the block, would violate an individual's rights") (internal quotations and citations omitted); *Stroman v. Wetzel*, 2020 WL 1531325, at *6 (M.D. Pa. Mar. 31, 2020) ("Defendants simply could not have recognized that their use of OC spray in response to another inmate's actions across the block would violate a 'clearly established statutory or constitutional right[ ] of which a reasonable person would have known'") (citations omitted).

Given that Alexander has failed to allege that Defendants violated a clearly established right in this setting, Defendants are entitled to qualified immunity on this Eighth Amendment claim.

### E.  Fourth Amendment Cell Search Claim

The Fourth Amendment provides that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported

27

**JA32**

by Oath or affirmation, and particularly describing the place to be
searched, and the persons or things to be seized.

U.S. CONST. amend. IV.  The prohibitions contained within the Fourth Amendment are

applicable to the states by virtue of the Due Process Clause of the Fourteenth Amendment.

*Cady v. Dombrowski*, 413 U.S. 433, 440 (1973).

To the extent that Alexander alleges that the search and seizure of his property

violates the Fourth Amendment, courts have repeatedly held that the Fourth Amendment is

not applicable to the contents of a prisoner's cell.  *See Hudson v. Palmer*, 468 U.S. 517,

530 (1984) ("prisoners have no legitimate expectation of privacy and . . . the Fourth

Amendment's prohibition on unreasonable searches does not apply in prison cells"); *Doe v.

Delie*, 257 F.3d 309, 316 (3d Cir. 2001) ("The defendants correctly assert that prisoners do

not have a Fourth Amendment right to privacy in their cells.") (citing *Hudson*, 568 U.S. at

529)).  Defendants' motion to dismiss the Fourth Amendment claim will be granted.

### F.  Fourteenth Amendment Due Process Claims

#### 1.  Procedural Due Process

The Fourteenth Amendment of the United States Constitution provides in pertinent

part that: "No State shall…deprive any person of life, liberty, or property, without due

process of law."  U.S. CONST. amend. XIV.  The United States Supreme Court has

mandated a two-part analysis of Fourteenth Amendment procedural due process claims.

*See Ingraham v. Wright*, 430 U.S. 651, 672 (1977).  First, the reviewing court must

determine "whether the asserted individual interests are encompassed within

28

**JA33**

the…protection of 'life, liberty or property.'" *Id.* If a protected interest is implicated, the court must "decide what procedures constitute 'due process of law.'" *Id.* If no protected interest is implicated, however, then "it is unnecessary to analyze what procedures were followed when an alleged deprivation of an interest occurred." *Harris v. Hines*, 2017 WL 4119743, at *5 (M.D. Pa. Sept. 18, 2017).

"To state a claim under § 1983 for deprivation of procedural due process rights, a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law.'" *Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006) (citing *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)).

### a. Cell Search and Confiscation of Property

Ordinarily, the concept of "due process" requires some type of hearing before the state can deprive a person of a protected interest. *Zinermon v. Burch*, 494 U.S. 113, 126 (1990) (collecting cases). However, in cases of random and unauthorized deprivations of property the State cannot predict when the loss will occur and, therefore, is unable to provide a meaningful hearing before the deprivation takes place. The Supreme Court determined that, with respect to negligent, random and unauthorized acts by state actors that result in the loss of a protected interest, a plaintiff does not suffer a violation of procedural due process if he or she has an adequate post-deprivation remedy. *Parratt v.*

29

**JA34**

*Taylor*, 451 U.S. 527 (1981). The Supreme Court subsequently extended the rule in *Parratt* to apply to intentional acts by state actors. *Hudson v. Palmer*, 468 U.S. 517 (1984); *see also Barr v. Knauer*, 321 F. App'x 101, 103 (3d Cir. 2009) (nonprecedential).

The Third Circuit Court of Appeals has held that the state's grievance procedure provides an adequate post-deprivation remedy, *see*, *e.g.*, *Tillman v. Lebanon County Corr. Fac.,* 221 F.3d 410, 422 (3d Cir. 2000), and that the existence of this post-deprivation remedy forecloses any due process claim, *Austin v. Lehman*, 893 F. Supp. 448, 454 (E.D. Pa. 1995), even if an inmate is dissatisfied with the result of the process. *Iseley v. Horn*, 1996 WL 510090, at * 6 (E.D. Pa. 1996). "Because prisons are constitutionally required to afford inmates only a post-deprivation remedy,...the defendants' failure to give the inmates prior notice of their intended seizure of their materials did not violate the plaintiffs' Due Process rights." *Monroe v. Beard*, 536 F.3d 198, 210 (3d Cir. 2008).

Alexander alleges that Defendants deprived him of his personal property following the cell search. (Doc. 17 ¶¶ 68-76). The DOC has a grievance process that provides for sufficient post-deprivation remedies—even if Alexander is dissatisfied with the result of that process. It is clear that Alexander had notice of the grievance policy and utilized that grievance procedure. The Court will grant the Defendants' motion to dismiss with respect to this procedural due process claim.

30

**JA35**

### b. Inmate Misconduct[3]

The filing of a false disciplinary misconduct alone does not violate a prisoner's

constitutional rights, even if it may result in the deprivation of a protected liberty interest.

*See Hutchinson v. Kosakowski*, 2015 WL 3737656, at *4 (M.D. Pa. 2015) (citing *Freeman v.*

*Rideout*, 808 F.2d 949, 951 (2d Cir. 1986)).  However, inmates must be provided due

process of law prior to being deprived of a protected liberty interest.  *Id.*  Accordingly, "so

long as certain procedural requirements are satisfied, mere allegations of falsified evidence

or misconduct reports, without more, are not enough to state a due process claim."  *Id.*

(citing *Smith v. Mensinger*, 293 F.3d 641, 654 (3d Cir. 2002); *Freeman*, 808 F.2d at 953).

The fact that Alexander was found guilty at a misconduct hearing is not in itself a due

process violation.  Due process protections attach in prison disciplinary proceedings in

which the loss of good-time credits is at stake.  *See Wolff v. McDonnell*, 418 U.S. 539, 564-

65 (1974).  In *Wolff*, the Supreme Court held that an inmate must receive "(1) advance

written notice of the disciplinary charges; (2) an opportunity, when consistent with

institutional safety and correctional goals, to call witnesses and present documentary

evidence in his defense; and (3) a written statement by the factfinder of the evidence relied

on and the reasons for the disciplinary action."  *Superintendent v. Hill*, 472 U.S. 445, 454

---

[3]    Alexander has expressly disclaimed Defendants' characterization of his disciplinary hearing
claim as a procedural due process claim.  (Doc. 27, p. 15 n. 19).  Nevertheless, the Court will assess
whether the facts alleged in the amended complaint support a procedural due process claim.

31

**JA36**

(1985).  Because Alexander does not allege that he suffered a loss of good conduct time, the *Wolff* protections are inapplicable.  (*See* Doc. 17 ¶ 106).

Moreover, the Due Process Clause does not provide protection against the imposition of discipline, including disciplinary confinement and the loss of various privileges inasmuch as these other forms of discipline do not "impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Torres v. Fauver*, 292 F.3d 141, 150-51 (3d Cir. 2002) (citing *Sandin v. Conner*, 515 U.S. 472, 486 (1995)). Confinement in administrative or punitive segregation is insufficient, without more, to establish the kind of "atypical" deprivation of prison life necessary to implicate a liberty interest.  *Sandin*, 515 U.S. at 486; *see Griffin v. Vaughn*, 112 F.3d 703, 706-07 (3d Cir. 1997).  Alexander alleges that Defendant Ellenberger denied him witness testimony, the opportunity to present evidence, and that he was biased during the misconduct hearing. Alexander does not allege that he was subjected to an atypical and significant hardship. Moreover, placement in disciplinary confinement does not impose an atypical and significant hardship on an inmate in relation to the ordinary incidents of prison life.

### c.  Recommendation for DEMO Program

Alexander also alleges that Defendants violated his procedural due process rights by recommending his placement within the DEMO program.  (Doc. 17 ¶¶ 108-110).  It is well-established that an inmate does not have a constitutional right to any particular custody or security classification.  *Moody v. Daggett*, 429 U.S. 78, 88 (1976); *Montanye v. Haymes*,

32

**JA37**

427 U.S. 236, 242. Because prisoners have no inherent constitutional right to a particular custody or security classification, Defendants' motion to dismiss this due process claim will be granted.

### 2. Substantive Due Process

Alexander's substantive due process claim is barred by the "more specific provision rule." In adopting the "more-specific-provision-rule" established in *County of Sacramento v. Lewis*, 523 U.S. 833, 843-44 (1998), the Third Circuit noted that "[u]nder this rule, 'if a constitutional claim is covered by a specific constitutional provision…, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.' *United States v. Lanier*, 520 U.S. 259, 272 n. 7, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (clarifying prior holing in *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989))." *Betts*, 621 F.3d at 260-61. Alexander's substantive due process claims fit squarely within his constitutional claims—i.e., his cell search claim is duplicative of his Fourth and Eighth Amendment claims. Thus, the more-specific-provision rule forecloses any substantive due process claim.

### G. Violation State Law and of DOC Policy

Alexander asserts that Defendants violated Title 37 of the Pennsylvania Code and an internal DOC policy. (Doc. 17 ¶ 136). These allegations do not rise to the level of a constitutional violation.

33

**JA38**

Violations of state law, assuming any such violations occurred here, do not on their

own amount to a constitutional violation. *See Whittaker v. Cnty. of Lawrence*, 437 F. App'x

105, 109 (3d Cir. 2011) ("[A] state official's failure to follow state law does not, by itself,

shock the conscience [in violation of the constitution] in the absence of additional facts.");

*Maple Properties, Inc. v. Twp. of Upper Providence*, 151 F. App'x 174, 179 (3d Cir. 2005)

(explaining that "'[a] violation of state law is not a denial of due process of law.'" (quoting

*Coniston Corp. v. Village of Hoffman Estates*, 844 F.2d 461, 468-69 (7th Cir. 1988))).

Additionally, "a prison policy manual does not have the force of law and does not rise to the

level of a regulation" and that "a violation of internal policy does not automatically rise to the

level of a Constitutional violation." *Atwell v. Lavan*, 557 F. Supp. 2d 532, 556 n.24 (M.D. Pa.

2007) (citations omitted); *see Bullard v. Scism*, 449 F. App'x 232, 235 (3d Cir. 2011)

(nonprecedential) (explaining that, even if prison officials violated a regulation, such a

violation "is not actionable"); *Jordan v. Rowley*, No. 1:16-CV-1261, 2017 WL 2813294, at *2

(M.D. Pa. June 29, 2017); *see also United States v. Jiles*, 658 F.2d 194, 200 (3d Cir. 1981)

(noting that even violations of state law will not automatically have a "constitutional

dimension"). Accordingly, Alexander has not alleged a plausible constitutional violation

based on a violation of Title 37 and a violation of DOC policy. These claims will be

dismissed.

### H.  Lack of Standing to bring Defamation Claim

Alexander appears to assert a defamation claim on behalf of his daughter.  (Doc. 17 ¶¶ 106, 136).  It is well-settled law that "prudential standing requires, *inter alia,* that a litigant assert his or her own legal rights and not rely on the rights or interests of third parties**."**  *Hill ex rel. Hill v. Pennsylvania Dept. Of Corrections,* 2013 WL 1320413 *1 (3d Cir. 2013).  To the extent that Alexander seeks to raise a defamation claim on behalf of his daughter, he lacks standing to do so.  This claim will be dismissed.

### I.  Defendants are entitled to Sovereign Immunity on the Defamation Claim

Defendants also seek dismissal of Alexander's defamation claim, arguing that the doctrine of sovereign immunity bars this claim against state employees.  (Doc. 25, pp. 35-36).  Defendants are entitled to sovereign immunity with respect to Alexander's state law claim as it is beyond dispute that "[t]he Department of Corrections is an agency of the Commonwealth and the Defendants, as employees of an agency of the Commonwealth, are entitled to the protection afforded by sovereign immunity." *McGrath v. Johnson*, 67 F.Supp.2d 499, 511 (E.D. Pa. 1999) (citing *Maute v. Frank*, 441 Pa. Super. 401, 402, 657 A.2d 985, 986 (1995) (state prison officials enjoy sovereign immunity); *Robles v. Pennsylvania Dep't of Corrections*, 718 A.2d 882, 884 (Pa. Commw. Ct. 1998) (same)), *aff'd*, 35 F. App'x 357 (3d Cir. 2002).  As a general matter, subject only to ten specific statutory exceptions not applicable here, this sovereign immunity bars state law tort claims like the one alleged here, since Commonwealth employees are immune from liability for

**JA40**

either negligence or intentional torts.[4]  *McGrath*, 67 F.Supp.2d at 511, *aff'd*, 35 F. App'x 357 (3d Cir. 2002).  The Court will dismiss this claim.

### J.  Claims for Declaratory and Injunctive Relief

The case or controversy requirement of Article III, § 2 of the United States Constitution subsists through all stages of federal judicial proceedings.  Parties must continue to have a "personal stake in the outcome of the lawsuit."  *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477-78 (1990); *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975). The mootness doctrine recognizes that "[i]f developments occur during the course of adjudication that eliminate a plaintiff's personal stake in the outcome of a suit or prevent a court from being able to grant the requested relief, the case must be dismissed as moot." *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 698-99 (3d Cir. 1996).  An inmate's transfer from the facility complained of generally moots the equitable and declaratory claims.  *Abdul-Akbar v. Watson*, 4 F.3d 195, 206-07 (3d Cir. 1993); *see Griffin v. Beard*, 401 F. App'x 715 (3d Cir. 2010) (transfer from SCI-Huntingdon renders inmate injunctive relief claim moot).

_____

[4]    The ten categories for which sovereign immunity will not apply are: (1) vehicles in the possession or control of a Commonwealth party; (2) acts of health care employees of Commonwealth agency medical facilities or institutions; (3) the care, custody, or control of personal property; (4) a dangerous condition of Commonwealth agency real estate and sidewalks; (5) dangerous conditions of highways created by potholes or sinkholes; (6) the care, custody, or control of animals; (7) liquor store sales; (8) National Guard activities; (9) toxoids and vaccines; and (10) sexual abuse.  *See* 42 PA. CONS. STAT. ANN. § 8522(b).

Alexander is no longer housed at SCI-Smithfield.  In light of Alexander's transfer from SCI-Smithfield, the institution wherein the allegations related to his claims stem, his requests for injunctive and declaratory relief are now moot.

### K.  The PLRA bars any request for Compensatory Damages

Section 1997e(e) of Title 42 provides: "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."  42 U.S.C. § 1997e(e). More than a *de minimis* physical injury must be alleged as a predicate to allegations of mental or emotional injury.  *See Mitchell v. Horn*, 318 F.3d 523, 536 (3d Cir. 2003).  In the amended complaint, Alexander seeks compensatory damages.  (Doc. 17, p. 31).  However, Alexander does not allege that he suffered *any* physical injury, let alone a *de minimis* physical injury, as required for a predicate to emotional injury.  *See Mitchell*, 318 F.3d at 534-36.  He is not entitled to compensatory damages.

### L.  Official Capacity Claims

Lastly, Defendants assert that the claims against them in their official capacities fail because they are not "persons" under section 1983.  (Doc. 25, p. 40).  Personal capacity suits under section 1983 seek to recover money from a government official, as an individual, for acts performed under color of state law.  *Gregory v. Chehi*, 843 F.2d 111, 120 (3d Cir. 1988).  Official capacity suits, in contrast, generally represent an action against an entity of which the government official is an agent.  *Id.*; *see also Monell v. Dep't of Social Servs.*, 436

37

**JA42**

U.S. 658, 690 n. 55 (1978). When suits are brought against state officials in their official

capacities, those lawsuits are treated as suits against the state. *Hafer v. Melo*, 502 U.S. 21,

25 (1991). However, the doctrine of sovereign immunity, established by the Eleventh

Amendment, protects states, such as the Commonwealth of Pennsylvania, from suits by

citizens. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100-01, 117 (1984);

*Seminole Tribe v. Florida*, 517 U.S. 44, 54 (1996); *Lavia v. Pennsylvania*, 224 F.3d 190,

195-96 (3d Cir. 2000). That immunity runs to state officials if they are sued in their official

capacity and the state is the real party upon which liability is sought. *Scheuer v. Rhodes*,

416 U.S. 232, 237-38 (1974). Congress has not abrogated the immunity regarding

Alexander's claims, nor has Pennsylvania waived this grant of immunity. *See* 42 PA. C.S.A.

§ 8521(b). Thus, Alexander's section 1983 claim against the Defendants in their official

capacities is barred by sovereign immunity. *See Betts v. New Castle Youth Dev. Ctr.*, 621

F.3d 249, 254 (3d Cir. 2010). Defendants are entitled to dismissal on this ground.

## IV.    Leave to Amend

When a complaint fails to present a prima facie case of liability, district courts must

generally grant leave to amend before dismissing the complaint. *See Grayson v. Mayview

State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002); *Shane v. Fauver*, 213 F.3d 113, 116-17 (3d

Cir. 2000). Specifically, the Third Circuit Court of Appeals has admonished that when a

complaint is subject to dismissal for failure to state a claim, courts should liberally grant

leave to amend "unless such an amendment would be inequitable or futile." *Phillips*, 515

38

**JA43**

F.3d at 245 (citing *Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004)).  Since Alexander's

claims are factually and legally flawed and he has previously been granted leave to amend,

allowing further leave to amend would be both futile and inequitable.  *See Grayson*, 293

F.3d at 108; *see also Jones v. Unknown D.O.C. Bus Driver & Transp. Crew*, 944 F.3d 478,

483 (3d Cir. 2019) (where inmate plaintiff "has already had two chances to tell his

story…giving him further leave to amend would be futile.").

## V.    Conclusion

The Court will deny Defendants' motion to dismiss this action as untimely under

Pennsylvania law's two-year statute of limitations and will grant the motion in all other

respects.

A separate Order shall issue.

Robert D. Mariani
United States District Judge

Dated: January ___, 2024